MARGARET A. COWLEY, Respondent, *v.* REMY FABIEN, Doing Business as R. FABIEN & COMPANY, Appellant.

**Duress — withholding possession of personal property until payment of money.**

The act of withholding from a party entitled to it the possession of personal property until money is paid gives the payer his action to recover the sum paid.

*Cowley* v. *Fabien*, 139 App. Div. 913, affirmed.

(Argued November 28, 1911; decided January 16, 1912.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the second judicial department, entered June 23, 1910, affirming a judgment in favor of plaintiff entered upon a verdict.

*Frederic R. Coudert* and *Charles A. Conlon* for appellant.

*Leavitt J. Hunt* and *Robert McLeod Jackson* for respondent.

COLLIN, J. The plaintiff, as the assignee of the American Cocoanut & Importing Company, seeks, by this

action, to recover from the defendant the sum of $1,000, alleged to have been paid by plaintiff's assignor to the defendant under duress of property.

The judgment upon the verdict in favor of plaintiff has been affirmed by the Appellate Division, with a dissent on the part of two justices. We must read the record and affirm the judgment if we find any evidence or reasonable inferences therefrom in support of the verdict. (*Hickok* v. *Auburn Light, Heat & Power Co.*, 200 N. Y. 464; *Serano* v. *N. Y. C. & H. R. R. R. Co.*, 188 N. Y. 156; *Jerome* v. *Queen City Cycle Co.*, 163 N. Y. 351.)

The jury might have found as facts: Through the period from August, 1905, to March, 1906, the American Cocoanut & Importing Company (which in this opinion will, for brevity, be called the company), a corporation, was engaged in importing cocoanuts from Baracoa, Cuba, to Philadelphia. The plaintiff is the assignee of the company. The defendant was a banker and commission merchant at New York city. Adolfo R. Arguelles was a banker and importer and a correspondent and agent of the defendant at Baracoa. Charles J. Frye was the purchasing agent at Baracoa of the company, with the sole authority of buying cocoanuts and paying the price in cash as the company directed, with the money it forwarded. In August, 1905, the company and the defendant entered into the agreement that the defendant would forward to Frye at Baracoa the money paid to him by the company for that purpose, and procure insurance on the cocoanuts shipped by Frye, and be paid a stipulated commission therefor; and thereunder, prior to January 1, 1906, the defendant forwarded $30,000 to Frye, through Arguelles who paid Frye the moneys. In January, 1906, the agreement was changed in the particulars that the defendant should forward such sums as the bank of the company, the Central Trust & Savings Company of Philadelphia (hereinafter called the bank) should, under its arrangement with the company, guarantee in writing, and that when a vessel was loaded, the consular invoice and bill of lading

of the cargo, to the order of the bank, should accompany to the defendant a draft to his order for the moneys guaranteed and forwarded, drawn by Frye upon the bank or the company. January 9, 1906, the bank delivered to the defendant the guaranty: "We hereby guarantee to accept for the American Cocoanut & Importing Company, draft drawn against cargo of cocoanuts on the Schooner *E. A. Post*, providing the same is accompanied by consular invoice, bills of lading to the order of the Central Trust & Savings Company drawn by the Master of the said Schooner, and the insurance policy, if insured in Cuba, in our favor. The draft to be for a sum not to exceed $15.00 per 1000 of cocoanuts on board." The defendant forwarded thereunder $4,640.42 by cabling Arguelles on January 10 guaranteeing the draft of Frye on the cargo of the schooner *Post* for a sum not exceeding $15.00 per thousand nuts, the draft to be accompanied by insurance certificate, consular invoice and bill of lading to the order of the bank. The schooner *Post* was loaded with 309,000 cocoanuts, and on January 18 the draft for $4,640.42 and the shipping documents were forwarded to and in due course received by and paid to the defendant, and the documents delivered to the company. January 23, Frye, who was then in this country, tried to so arrange with the defendant that Arguelles would pay him money with which to buy cocoanuts as he needed to load a vessel, and Frye draw a draft upon the company, to the order of Arguelles or the defendant, to accompany the invoice, bill of lading and certificate of insurance, for the cost of the cargo. The defendant refused, and stated that if the company wanted a drawing account, its bank must indemnify him indefinitely for any amount Arguelles might pay over to Frye. At that interview the company, through its representative, said to the defendant that they would want Frye to have some money in loading the schooner *Canada* and that $1,000 in addition to the amount then in Frye's hands would probably be sufficient for that purpose. Frye urged the need of and solicited a greater sum and it was finally arranged that the amount

should be $2,500.  Immediately after this interview, and on January 23, 1906, defendant wrote Arguelles that Frye called upon him "and requested us to instruct you to advance funds to his representative in your place, said advance to be made according to his requirements for preparing the cargoes, and that he would then hand you a draft attached to the bill of lading and consular invoice; but as the guaranty given by the Central Trust and Savings Company of Philadelphia covers only the transaction upon the basis of the draft being attached to the shipping papers and the cargo to be computed at the rate of $15.00 per M. nuts, we replied to Mr. Frye that we could give no other instructions and that if he desired to make any arrangements he should do this with you direct, this of course without any guaranty on our part beyond that already given for drafts issued against cocoanut cargoes, for which instructions will be telegraphed to you as soon as they are transmitted to us by the Central Trust & Savings Co., and said drafts must be always attached to the shipping papers."  February 3, Arguelles wrote to the defendant in reply: "I also take note of what you say regarding Frey's drafts, but this gentleman has written to his agent here telling him that he had arranged with you that I would anticipate for your account the necessary funds to load the ships, taking afterwards the shipping documents in the form agreed. As you advise me nothing of the kind, it is to be believed that this is not so."  January 30, the bank gave a guaranty to the defendant for moneys to be used in loading the schooner *Canada* as follows: "Philadelphia, Jan. 30, 1906, R. Fabien Company, New York City, Gentlemen: We hereby guarantee to accept for the American Cocoanut & Importing Company draft drawn against cargo of cocoanuts on the schooner Canada, providing the same is accompanied by consular invoice, bills of lading to the order of the Central Trust & Savings Company, drawn by the Master of said Schooner, and the insurance policy, if insured in Cuba, in our favor. The draft to be for a sum not to exceed $15.00 per 1000 of cocoanuts on board," but

the defendant, under the instructions of the company, did not act upon it. During the first days of February the company told the defendant the fact that Frye had in his hands moneys of the company sufficient to purchase the 350,000 nuts for the schooner *Canada*, and they then agreed that the guaranty of the bank should be for $2,500 instead of the $15.00 per thousand nuts, and the defendant expressly agreed with the company that he would not permit any money to be paid out on the cargo of the *Canada* or advanced to Frye, except as guaranteed by the bank. February 6, the bank sent to defendant its guaranty addressed to him: "We hereby guarantee to reimburse you for any moneys that may be advanced by your agent in Baracoa to the American Cocoanut and Importing Company or their representative for the purchase of cocoanuts intended for shipment on the Schooner Canada pending his presentation of draft with documents, as indicated by our guarantee of January 30th; provided, however, that the amount advanced shall not exceed $2,500 on the Canada's cargo." February 7, the company asked the defendant to inform Arguelles that the guaranty was satisfactory, "so that there may be no delay in furnishing money to our representative in Baracoa." February 8, the company wired defendant to "withhold guarantee to Arguelles until further notice," and later in that day, after a telephonic conversation with the defendant, it wired: "Confirming our conversation by telephone, please advance to Arguelles $2,000 and insure cargo 350,000 nuts," to which defendant replied that he had already instructed his agent Arguelles to advance $2,500, and to that it assented, but told defendant that Frye had already received too much money to pay for the cargo; that it had overpaid Frye, up to that time, a sum of about $2,500 on these two cargoes, the *Post* and the *Canada*, but that Frye said that he owed the farmers, and had no money to pay them, and it had said to Frye, rather than be discredited in the tropics it would stand $2,000. On February 8, the defendant wired Arguelles to pay Frye $2,500 upon

the cargo of 350,000 cocoanuts of schooner *Canada*, the shipping documents to be to the order of the bank. February 10, defendant wrote Arguelles in part as follows: "We also confirm with copy inclosed, the cables which we sent you on the 8th inst., asking you to take the draft of Chas. Frye against delivery of bills of lading and consular invoice, to the order of The Central Trust & Savings Company of Philadelphia, of the cargo of the Schooner ' *Canada*,' consisting approximately of 350,000 cocoanuts, which we have insured here under our floating policy, and the draft of Mr. Frye, not to exceed $2,500 for the entire cargo. We hope that you will have well interpreted our cable. According to advice from Philadelphia, Mr. Frye had already received funds in advance for part of said cargo." The bill of lading for the cargo of the *Canada* was dated February 14, 1906, and was to the order of the defendant. In accordance with its agreement, the defendant insured the cargo in the sum of $5,800. On February 14, 1906, Arguelles wrote the defendant saying in part: "For the future and in order to escape the continual applications of Mr. Frye or his agent (unless it so suits you, that is, that as is done at present, I should keep the account with you, for in that case I have nothing to say), to advance them funds for the loading of the ship I hope that you will not accept any but lump payments, so that I can make the delivery here upon an order by cable from you, once for all." The defendant had cabled installments. February 14, a draft for $3,500 against the cargo of the schooner *Canada* to the order of Arguelles was drawn by " C. J. Frye per E. Lafita " and the invoice and a bill of lading to the order of the defendant procured and delivered to Arguelles, who on the following day forwarded them properly indorsed to the defendant with a letter in which he said: "I have placed to your debit the amount of $3,500 C'y, for above draft, and beg to say that I was compelled to accept this transaction, deviating somewhat from your instructions, in order to be guaranteed for an amount which I had advanced." February 24, the defendant wrote the com-

pany that he was in receipt of the shipping documents covering the cargo of 350,958 cocoanuts consigned to him, against which Frye had issued to the order of Arguelles a draft on him for $3,500 and that he was instructed to indorse the documents to it upon payment of said amount plus "our charges and disbursement, amounting to $192.78," and on the same day presented to it a bill in his favor as follows: "Feb'y 24, 1906. American Cocoanut & Import Company, 1308 Oriana Street, Philadelphia, Pa., to 1/8 commission on $3,500 advanced to Charles J. Frye through A. R. Arguelles in Baracoa on cargo of Schooner Canada $4.38," and another bill in the sum of $188.40 for insurance premiums and cablegrams on account of this cargo. The company paid both bills to the defendant. Those papers first informed the company that a sum greater than the $2,500 had been paid to Frye. February 26, the company wrote the defendant in part as follows: "Your favor of the 24th inst. is received, and in reply we desire to state that we have just wired you as follows: 'Don't draw, see letter, amount of draft should be $2,500.' There is a serious mistake somewhere. Our instructions to you were that you should permit a draft not to exceed $2,500 on this cargo. This was understood by every one concerned and the cargo was to come consigned to the Central Trust & Savings Co.," and asked him to draw a draft for $2,500. The defendant, on February 27, notified the company that unless the draft for $3,500 and his charges and disbursements were paid "we are instructed to sell cargo for account of whom it may concern." The company, having disposed of the cargo, paid the draft March 1, under protest and with notice that it would bring an action to recover the $1,000.

Beall, a witness in behalf of defendant, testified that he was present at a conference in New York, in the early part of February, between Walker, the representative of the company, and Frye, at which Frye stated that he had cabled to Baracoa to have a draft which was to be drawn made $2,500 and had a reply that the draft had already been made for $3,500 for the cocoanuts. Beall

did not give other testimony touching the issues. Walker, as a witness for the plaintiff, testified that Frye did not tell him while in New York or at any time that he received cabled instructions from Baracoa that more than $3,500 had been advanced; that Frye while in New York was constantly stating that he needed money and soliciting it and said he could not get any money from Arguelles unless " we had money in his hands or a guarantee in his hands," and never told him that Arguelles had advanced moneys to his agent, taking as security the bill of lading, and his testimony is corroborated by the request in his letter of February 7, that the defendant wire Arguelles of the receipt of the guaranty, " so that there may be no delay in furnishing money to our representative in Baracoa."

Arguelles testified, through a deposition as a witness for defendant, that he made loans to Mr. Frye at the exclusive request of Mr. Frye or his agent for the purchase of cocoanuts during the months of January and February, 1906, which he shipped by the schooner Canada for the amount of $3,500. He further testified that he received an order from the defendant to advance Frye, by order of the company, a part of said $3,500, to wit, $2,500; that when he made the loans to Frye or his agent he had no instructions whatsoever from the defendant and made the loans for himself from his funds. This evidence is strongly contradicted. *First*, by Arguelles' statements. The jury might reasonably infer from his letter of February 3 to the defendant that he had not advanced and would not advance any moneys to Frye or his representative except as authorized by the defendant and for his account. They may not have believed that Frye would write to his agents that he had arranged with the defendant that Arguelles should pay over the necessary funds, after Arguelles had paid them over, or that Arguelles then would write to the defendant " as you advise me nothing of the kind it is to be believed that this is not so." In his letter of February 14 to the defendant, (he on February 8 received defendant's order to pay over to Frye a sum not exceeding $2,500) he

told him *that he was charging him with all sums paid Frye or his agent* upon their continual applications, and that unless that suited the defendant he hoped that the defendant would accept only lump payments, so that he could make the delivery there upon an order by cable from defendant "once for all." In his letter of February 15 to the defendant, he told him *that he had charged him with the* $3,500, *and that in paying over that sum he had deviated "somewhat from your (the defendant's) instructions."* The jury may well have thought that he could not deviate from instructions in making the payments if he made them before he received any instructions; that if he was making the loans for himself from his funds no person could give him instructions, and that he did not pay moneys to Frye or his agent for himself and on his own account when he charged the defendant with them. *Second,* by the fact that the defendant, with knowledge of all the facts, charged and received from the company his stipulated commission on the sum of $3,500 "advanced to Charles J. Frye through A. R. Arguelles in Baracoa on cargo of schooner Canada." *Third,* by the fact, that through the late part of January and the early part of February, Frye was attempting to arrange with the defendant that Arguelles should advance moneys as Frye requested, because Arguelles would pay over only as he had the moneys or the guaranty therefor from the defendant. Arguelles further testified: "I know that the amounts delivered by me to Mr. Frye or his agent were used in the purchase of cocoanuts, because having his business house near mine, I was a permanent witness of his operations and for the same reason I saw when they were shipped to the schooner *Canada.*" The jury might have found that Frye or his agent had moneys belonging to the company sufficient to pay for the cargo; and it was for them to say whether the ground of Arguelles' knowledge, as stated by him, truthfully informed him that the cocoanuts were paid for by the moneys from Arguelles, rather than with the moneys of the company. We must assume that the

jury solved the contradictions by findings favorable to the plaintiff.

The jury may in reason and with ample justification have found that the defendant had knowledge, when the guaranty for the cargo of the *Canada* was delivered him, that Frye had moneys of the company, which with the $2,500 were more than the cost of the cargo; that his instructions and authority were that he should forward Frye a sum not exceeding $2,500 and that he expressly agreed with the company that he would not forward or advance or permit to be forwarded or advanced a sum exceeding the $2,500; and would procure the invoice, bill of lading and certificate of insurance to be to the order of the bank; that Arguelles did not pay any moneys to Frye or his agent for loading the *Canada* until after he received instructions from the defendant; that the defendant knew that the cargo included a substantial quantity for which the company had paid with moneys not a part of the $3,500 and to which it had an indubitable right of possession; that he forwarded or caused to be paid to Frye $1,000 in addition to the $2,500 and had himself made the consignee; that Arguelles did not loan or pay over to Frye for himself or his account any money, but acted throughout as the agent of the defendant, who ratified and adopted as his own his payments and acts, and that the defendant refused to allow the company to take possession of the cargo or any part thereof until it had paid him the full sum of $3,692.78. Those facts support the verdict.

It is an established rule of law that the act of withholding from a party entitled to it the possession of personal property until money is paid, gives the payer his action to recover the sum paid. (*Scholey* v. *Mumford*, 60 N. Y. 498; *Cobb* v. *Charter*, 32 Conn. 358; *Harmony* v. *Bingham*, 12 N. Y. 99; *Stenton* v. *Jerome*, 54 N. Y. 480; *Lonergan* v. *Buford*, 148 U. S. 581.) The defendant obtained possession of the cargo through his violation of a legal duty. His primary duty as the agent of the company with limiting instructions was to adhere faithfully

to those instructions. The verdict established that he either directly or through his sub-agent, Arguelles, disobediently and wrongfully forwarded to Frye the sum of $1,000. He obtained possession of the cargo through the breach of his express agreement with the company that he would neither forward nor permit to be forwarded to Frye a sum exceeding $2,500. If Arguelles, his sub-agent, exceeded the authority, he is liable for his wrongdoing. (*Barnard* v. *Coffin*, 141 Mass. 37; *Commercial Bank of Penn.* v. *Union Bank of N. Y.*, 11 N. Y. 203; Mechem on Agency, section 197.) Moreover, he ratified and adopted as his own the payments and acts of Arguelles. His possession was through his violation, further, of his agreement and instruction that he would cause the invoice, the certificate of insurance and the bill of lading to be made to the order of the bank. There cannot be any principle of law which justified or protects the action of the defendant. The claim for which he held the property arose from his illegal and wrongful acts, and was unjust and invalid. The defendant did not voluntarily pay it.

The judgment should be affirmed, with costs.

GRAY, J. (dissenting). This action was brought to recover from the defendant a sum of money, which, it is alleged, the plaintiff's assignor was compelled to pay to the defendant under duress, in order to obtain the possession of property. The plaintiff's assignor was the American Cocoanut & Importing Company; which, in 1905 and 1906, was engaged in the business of importing cocoanuts from Cuba to the city of Philadelphia, in the state of Pennsylvania. For that purpose it had employed Frye as its purchasing agent, and had limited his authority to purchases of the nuts at a specified price and to payment for them from moneys that the company would forward to him. Arrangements were entered into with the defendant, who was a banker and commission merchant in the city of New York, at first, for the transmission of the company's moneys to its agent, Frye, in Cuba

and, later, for advances to be made by the defendant to Frye, at the rate of $15 per 1,000 cocoanuts, to be secured by a letter of guaranty of the Central Trust & Savings Company of Philadelphia. In February, 1906, the period in which occurred the transactions giving rise to this action, the cocoanut company arranged with the defendant for an advance to Frye of $2,500 upon a cargo of cocoanuts, to be shipped by the vessel "Canada," and furnished a guaranty by the trust company, dated on February 6th, "to reimburse you, (him), for any moneys that may be advanced by your agent in Baracoa to the American Cocoanut & Importing Company, or their representative, for the purchase of cocoanuts intended for shipment on the schooner Canada, pending his presentation of drafts with documents * * * provided, however, that the amount advanced shall not exceed $2,500 on the Canada's cargo." Of this arrangement Fry, being then in New York, was informed. The defendant's correspondent in Baracoa was Arguelles and the next day the company requested the defendant, by letter, if the guaranty was satisfactory, to telegraph him; that there might be no delay in furnishing money to its representative in Baracoa. The defendant, on February 8th, cabled Arguelles, in effect, to advance to Frye on the Canada's cargo, against delivery of shipping documents made out to order of the Central Trust & Savings Company, $2,500, only. On February 24, 1906, the Cocoanut Company received a notice from the defendant of the arrival of the "Canada" and that "we are in receipt of the documents covering the cargo of 350,958 cocoanuts on schooner 'Canada,' consigned to ourselves, against which has been issued by Charles J. Frye to order of A. R. Arguelles a draft on ourselves for $3,500, amount that had been advanced by Arguelles to Fry on said cargo. We have instructions to endorse the documents to you upon payment of said amount, plus our charges and disbursements, amounting to $192.78. * * * Unless we hear from you to the contrary before 1 P. M. by telegraph on Monday, 26th instant, we shall draw on the Central

37

Trust & Savings Co. for $3,692.78 at sight, attaching bill of lading, consular invoice and insurance certificate and you will please see that our draft be honored at presentation." To this the company replied, by telegraph, not to draw; "amount of draft should be $2,500," and, also, wrote, reminding defendant that his instructions did not permit a draft on the cargo exceeding that sum and that Arguelles must collect "the additional thousand" from Frye. The defendant replied that the advances of $3,500 had been made by Arguelles before receiving special instructions and that, unless paid in full, he was "instructed to sell the cargo for account of whom it may concern." Thereupon, the company's manager telephoned the defendant that the draft would be paid under protest and that he would be held for the $1,000. The next day he telegraphed him to draw on the company through its Philadelphia bank. When advised by defendant of his having drawn, it was replied that "we will honor this draft without prejudice to our rights" and that the company expected to be reimbursed the $1,000, "inasmuch as you have permitted your agent in Baracoa to exceed his authority by permitting an overdraft of $1,000." The draft was paid and by this action the assignee of the company's claim seeks to recover back the sum of $1,000. It appears from the testimony of Arguelles that he had actually advanced $3,500 to Frye, or to Frye's representative at the time, for the cocoanut company, before receiving the defendant's cable of February 8th, instructing an advance of $2,500, only, upon the "Canada's" cargo. He testified that, when he made the loan, he "had no instructions whatsoever" from the defendant; that he knew that the moneys supplied by him "were used in the purchase of cocoanuts," and that they were shipped to the schooner "Canada." It was for that reason that the draft was made out to his order and that he had had the shipping documents run to the defendant; whom he had instructed, when forwarding the papers, either to turn over the cargo to the cocoanut company, upon payment of the draft, or to sell it in the

event of non-payment. This evidence of Arguelles is not contradicted by any evidence of the plaintiff. Arguelles was a banker and merchant, in Baracoa, and was a correspondent of the defendant. He was not his agent, otherwise than as his agency might be availed of in business matters. That the $3,500 had been advanced by Arguelles upon the cargo and a draft for that amount given him was, also, testified to by a witness, Beall, who was present at an interview between Frye, then in New York, and the manager of the cocoanut company, when Frye stated the fact. This testimony was not contradicted upon the manager's later examination.

I think that the facts have been sufficiently referred to, in order to understand the situation at the time, when, as the plaintiff alleges, her assignor, the cocoanut company, was coerced into paying to the defendant a sum of money, in excess of what he had the right to demand under the agreement between them, as a condition of obtaining the cargo of cocoanuts, which had been consigned to him. That situation was that Frye, the agent of the cocoanut company in Cuba, had exceeded his authority in borrowing upon the " Canada's " cargo, to the extent of $1,000, and that the defendant, through the arrangements made with him by the company for a credit to Frye, knew of the latter's limited authority. That Arguelles was acting as the defendant's agent in executing these business transactions is not material; if, as the uncontroverted evidence is, he had made the advance to the company's agent before being informed by the defendant of the limitation of credit to $2,500. Two courses were open to the plaintiff's assignor; it could repudiate the act of Frye, as having been in excess of his authority, and refuse to be bound by the transaction; or it could pay the draft, accept the cargo and hold its agent liable for any damages it could prove to have been sustained as the result. If the plaintiff could show that there had been any breach by the defendant of his agreement in the matter with her assignor, the cocoanut company, then, possibly, an action might lie against.

him for damages if any were sustained in consequence of the breach assigned. But the plaintiff is not seeking to recover for any damages occasioned to her assignor. Evidence bearing upon the question of whether the company suffered any loss was objected to by her and was excluded. The plaintiff stands upon a cause of action arising in the alleged duress exercised upon the cocoanut company by the defendant when refusing to deliver the cargo "until $1,000 was paid, over and above the amount which the cocoanut company had authorized him to expend." Was there duress of property in law? It is well settled that there is such duress when a party has in his possession property belonging to another and refuses to deliver it to that other unless the latter pays him a sum of money, which he has no right to receive, and, in order to obtain possession of his property, the other pays that sum. Money so paid is a payment by compulsion. (*Shaw* v. *Woodcock*, 7 B. & C. 14; *Scholey* v. *Mumford*, 60 N. Y. 498.) As it was said in *Scholey* v. *Mumford*, (*supra*), "an action will lie to recover back money paid to release goods wrongfully detained on a claim of lien." (p. 501.) The essential foundation for such an action is, always, the illegal character of the claim asserted by the holder of the goods against their owner and the compulsion upon the latter to do that which he would not do voluntarily. I think that there was no duress in law, here. The defendant had the right to receive the sum he demanded of the cocoanut company, as the condition of his assigning to it the cargo; because that sum represented the moneys advanced by Arguelles to the company through its agent, upon the shipment of the cocoanuts. If the cargo was not obtained through the use of the moneys advanced, the burden was upon the plaintiff to show the fact. There was no such proof. The company's agent purchased with Arguelles' money and by his procurement the title of his principal was subjected to the right of Arguelles to claim reimbursement of the moneys obtained from him. This constituted the demand of the defendant; to whom Arguelles had caused the cargo to be consigned, as secur-

ity for the payment of the draft for $3,500, drawn on the former. As has been stated, above, the moneys were advanced for the cargo and whatever the departure of Frye, the company's agent, from his authority, it came into the defendant's hands pledged for their repayment. In view of the facts, the company, repudiating its agent's act, might have refused to take the cargo; or it could have paid the draft and have taken the goods, reserving a claim for any resultant damages against Frye. There was, therefore, no coercive proceeding on the defendant's part to exact a wrongful payment of money and if that be true, then, there was no cause of action in duress.

For these reasons, I think that the complaint should have been dismissed and, for the error in denying the defendant's motion for a dismissal, the judgment should be reversed and a new trial ordered; the costs to abide the event.

HAIGHT, VANN and HISCOCK, JJ., concur with COLLIN, J.; CULLEN, Ch. J., and CHASE, J., concur with GRAY, J. Judgment affirmed.