Submitted on motion to strike bill of exceptions August 20, motion denied September 14, 1927, argued September 20, reversed November 27, 1928, rehearing denied January 8, 1929.

## DARLING–SINGER LUMBER CO. v. ORIENTAL NAVIGATION CO.

(259 Pac. 420; 272 Pac. 275.)

For the motion, *Messrs. Wood, Montague & Matthiessen* and *Mr. Gunther F. Krause.*

*Contra, Mr. Allen H. McCurtain.*

RAND, J.—The rules of the Circuit Court for Multnomah County provide:

"Rule 36. Any party to a civil or criminal action may within thirty days after the entry of final judgment tender a bill of exceptions.

"Rule 37. It shall not be necessary to enter an order in the Journal granting time in which to tender a bill of exceptions unless the Court by special order extends or shortens the time within which to tender same."

The bill of exceptions herein after having been settled and allowed by the trial judge was filed in this court and among other things it recites that it was not tendered within the time provided for by the rules, or any extension thereof. Upon that ground alone respondent moves to expunge the same from the record here. Upon this question there has been a conflict of decision in this state. In *Che Gong* v. *Stearns*, 16 Or. 219 (17 Pac. 871), it was held that:

"No time is fixed by any statute in this State within which a circuit judge may sign a bill of exceptions, or denying his right to sign it after the term. Hill's Code, section 231, provides: 'The point of the exception shall be particularly stated, and may be delivered in writing to the judge, or entered in his minutes, and at the time or afterwards be corrected until made conformable to the truth'; and section 233 provides: 'The statement of the exception when settled and allowed shall be signed by the judge and filed with the clerk, and thereafter it shall be deemed and taken to be a part of the record of the cause." * * No doubt the better rule of practice is to have the bill of exceptions signed and filed during the term at which the judgment is rendered, or such further time as may be allowed by order for that purpose; but in a mere matter of practice which may be affected by circumstances that cannot be foreseen, I am unwilling to lay down an unbending inflexible rule which shall tie the hands of the circuit judges and prevent them from completing the record in cases tried before them, if not done during the term or within some time to be fixed by order.

It is a power that pertains to the records of the Circuit Courts, and I think its exercise may be safely left to the sound judicial discretion of the circuit judges. In their hands it is not likely to be abused, but will be used in furtherance of justice. A party has a right of appeal, to be exercised in a civil case within six months after the judgment, and in a criminal case within one year thereafter. If during the trial he took exceptions which were reduced to writing, or noted on the judge's minutes, and for any satisfactory cause was unable to have his bill of exceptions drawn out in form and signed during the term, there can be no doubt that the judge who presided at the trial has the power to sign the same afterwards, and it becomes a part of the record with the same effect as if signed during the term.''

There was no rule of court involved in that decision and in that case a writ of *mandamus* was issued directing the circuit judge to sign and certify to the bill of exceptions, although more than six months had elapsed after the entry of judgment and before the bill of exceptions had been tendered, and so far as the decision shows there was no extension of time granted.

As a basis for the conclusion reached in that case Mr. Justice STRAHAN among other things said:

'' * * So in considering the effect of a provision in the Code of California requiring a bill of exceptions to be made within ten days after the trial, the Supreme Court of that State said: 'We think that the statute directing a statement to be made within ten days, and signed by the judge in a criminal case, is directory merely. The phraseology is different from that of the practice act in reference to like provisions in civil cases, and the reason of the rule is likewise different. It would be holding the rule with great rigor to hold a prisoner absolutely precluded of his rights by the failure of the judge to

settle or sign a statement within a limited time.' (*People* v. *Woppner,* 14 Cal. 437.) And the same principle is announced in *People* v. *Lee,* 14 Cal. 510.

"In *People* v. *White,* 34 Cal. 183, the bill of exceptions was not settled and allowed until nearly a year after the trial, and the attorney-general suggested that the same should be disregarded; but the court refused to act upon this suggestion and said: 'Why there was so long delay does not appear; but it is settled that the statute in relation to the time within which bills of exceptions should be tendered and settled is directory (Crim. Prac. Act, § 435), and that this court will not inquire into the reasons which induced the judge below to sign them after the time fixed by the statute, but will presume they were sufficient.' A similar statute in the State of Nevada has received the same construction." (*State* v. *Salge,* 1 Nev. 455; *State* v. *Baker,* 8 Nev. 141.)

In *Henrichsen* v. *Smith,* 29 Or. 475 (42 Pac. 486, 44 Pac. 496), this court said: "Nor could the failure of the defendants to submit their bill of exceptions within the time limited defeat the right to vacate the judgment or exhaust the power of the judge thereafter to sign the bill of exceptions." Again, in *McElvain* v. *Bradshaw,* 30 Or. 569 (48 Pac. 424), this court speaking through Mr. Justice BEAN said:

"Our statute does not prescribe the time in which a bill of exceptions shall be presented for settlement and allowance, and in practice it is permitted after the expiration of the term at which the trial is had; but obviously it should be done whilst the evidence and rulings of the court are fresh within the recollection of the trial court and counsel, and, therefore, it is eminently proper that it be settled either during the term or within some definite time thereafter: 3 Enc. Pl. & Pr. 468. But, while this is so, an order to that effect is not conclusive, but the trial judge may disregard it, and sign the bill after the expiration of the time allowed (3 Enc. Pl. & Pr.

462; *Marye* v. *Strouse,* 5 Fed. 494; *Coe* v. *Morgan,* 13 Fed. 844); and if he does so, we will not inquire into the reasons which may have induced the act, but will presume they were sufficient.

"The right of a trial court to limit the time for the settlement of a bill of exceptions is indispensable to the orderly administration of the law, and it is entirely proper that the appellant be required to tender his proposed bill within the time fixed, or give a sufficient excuse for not doing so. But, when a reasonable excuse is shown, the trial judge should not hesitate to settle and allow it, notwithstanding the expiration of the time."

In *State ex rel.* v. *Estes,* 34 Or. 196 (51 Pac. 77, 52 Pac. 571, 55 Pac. 25), in respect to the power of the Circuit Court to amend or change a bill of exceptions after it has been settled and allowed to make it conform to the facts, this court said:

"If, however, a bill of exceptions, through inadvertence or mistake, has been so made up as not to fairly and truly recite or represent what it purports to show as having actually transpired during the course of the proceedings, it may, by order of the court entered *nunc pro tunc,* upon proper notice, be so amended at a subsequent term as that it will accord with the real facts": Citing authorities. "And this may be done pending an appeal." Citing additional authorities.

In *Weinstein* v. *Wheeler,* 127 Or. 406 (257 Pac. 20), decided June 21, 1927, it was held:

"That the trial court may sign and certify to a bill of exceptions which was not tendered within the time limited by the previous orders of the court, and that it is his duty to do so whenever sufficient reason for the delay exists, and that whether or not he should sign and certify to a bill of exceptions when presented after the time allowed is within the sound judicial discretion of the trial judge, and

that in the exercise of this discretion, unless there has been a clear abuse thereof his action will not be reviewed upon appeal, is settled by an overwhelming weight of authority in this state." Citing authorities.

In *Oxman* v. *Baker County,* 115 Or. 436 (234 Pac. 799, 236 Pac. 1040), on motion to strike the bill of exceptions because not tendered for settlement within the time limited by the established rules of the trial court, the motion was sustained upon the ground that, "Where a court has established rules for its government and that of suitors, there exists no discretion in the court to dispense at pleasure with their rules, or to innovate on established practice," citing among other cases *Coyote etc. Co.* v. *Ruble,* 9 Or. 121, and *Schnitzer* v. *Stein,* 96 Or. 343 (189 Pac. 984).

 The rule of court under consideration was a mandatory rule which left no discretion where there had been a violation thereof in the trial court and the principle announced, and followed in that case under the facts as they there existed was correctly stated by the court. But in this case the rule is not mandatory; it is directory merely and leaves the power in the court to exercise a reasonable discretion in a proper case. The distinction between a mandatory rule and one which is directory merely is as well recognized as the distinction between a mandatory and a directory statute. If the statute is mandatory or if the rule of court is not unreasonable or in conflict with some rule of law, and is mandatory and limits the power of the court as well as of the parties to the litigation, its provisions must be complied with and acts done in noncompliance therewith are void. But if a statute or rule is directory merely, it does

not render the doing of the prescribed act at a different time or in a different manner void. The rule in question is directory merely, and this or a similar rule identical in terms and meaning has been twice construed by this court where it was held that a bill of exceptions tendered after the time provided for in the rule had expired and then settled and filed here was sufficient.

In *Francis* v. *Mutual Life Ins. Co.*, 61 Or. 141, 144 (114 Pac. 921, 922), this court said:

"The effect of the rule in declaring that any party to a civil or criminal action may within thirty days prepare and file a bill of exceptions is to obviate the necessity of making an order in each particular case prescribing the time within which the bill shall be presented. The restriction is applied only to the parties. Under this rule the trial court in its discretion might say to the party, 'You have not availed yourself of the time allowed by the standing rule,' and so deny the application for an extension. On the other hand, the court might, without a showing, extend the time, without any abuse of its prerogative. The rule does not amount to an abdication in any degree of the power of the court in that respect. On the contrary, the last paragraph of the rule expressly reserves to the court the discretion of allowing the extension of time to file a bill of exceptions. It is not stated in the rule that the application for such extension must be made within the thirty days first mentioned."

In *John Deere Plow Co.* v. *Silver Mfg. Co.*, 118 Or. 62 (216 Pac. 743, 245 Pac. 1083), this court again said:

"The whole doctrine to be derived from these cases is that, while a court is not bound to settle and approve a bill of exceptions after the time specified in the rule or granted by the court, it may do so

if in its judgment the excuse presented for noncompliance with the rule is sufficient."

Under these decisions where the rule limiting the time for tendering a bill of exceptions is directory merely, it is clear that the trial judge after the time limited by the rule has expired has power to sign and settle the bill of exceptions, and that if he does so this court will not inquire into his reasons for so doing, and from this it follows that the motion must be overruled. MOTION OVERRULED.

ON THE MERITS.

For appellant there was a brief over the names of *Mr. George W. Gearhart, Mr. Allen H. McCurtain* and *Mr. Donald E. Long,* with oral arguments by *Mr. Gearhart* and *Mr. McCurtain.*

For respondent there was a brief over the name of *Messrs. Wood, Montague & Matthiessen,* with an oral argument by *Mr. Erskine Wood.*

McBRIDE, J.—This action involves the right of plaintiff to recover money paid by the plaintiff to the defendant under protest, which sum was claimed by defendant for demurrage charges under a charter-party, by which the defendant agreed to carry a cargo of lumber and piling for plaintiff from Portland, Oregon, to Puerto Colombia, South America.

The findings of fact show that the parties entered into a charter-party by which plaintiff agreed to provide and furnish to the defendant's steamer a full and complete cargo, 3,600,000 feet B. M., 10 per cent less ship's option of sawn lumber or piling as follows:

"Approximately one million four hundred seventy-five thousand ($1,475,000') B. M. timbers and/or planks. Approximately six hundred twenty-five thousand feet (625,000') B. M. ties. Approximately one million two hundred fifty thousand feet (1,250,000') B. M. to one million five hundred thousand feet (1,500,000') B. M. piling not exceeding sixty (60) feet in length with the following approximate specifications:

"Seven hundred (700) pieces of thirty (30) feet long.

"Seven hundred (700) pieces forty (40) feet long.

"Seven hundred (700) pieces fifty (50) feet long.

"Seven hundred (700) pieces sixty (60) feet long.

"Under and on deck.

"And to pay the said party of the first part, for use of said steamer during the voyage aforementioned fifteen dollars ($15.00) United States Gold, per one thousand feet (1,000') B. M. not for all lumber and/or ties loaded, and fifteen dollars fifty cents ($15.50) United States Gold per one thousand feet (1,000') B. M. computed on basis of square mean diameter for all piling loaded. Freight payable in United States Gold without discount in Portland, Oregon, on signing of bills of lading and not returnable vessel and/or cargo lost or not lost.

"It is mutually agreed that P. L. I. B. certificates furnished by charterers on completion of loading is to be accepted as final figures on number of pieces and quantity of lumber loaded.

"It is agreed that the lay days for loading and discharging shall be as follows, commencing from

the time the captain reports himself ready to receive or discharge cargo.

"Loading to be at the average rate of not less than three hundred thousand feet (300,000') B. M. per running day, Sundays and holidays excepted, unless used at loading and discharging ports, discharge according to custom of port, but not less than an average rate of three hundred thousand feet (300,000') B. M. per running day, Sundays and holidays excepted, unless used at loading and discharging ports.

"At loading port and discharging port master is to give, in writing, to charterers twenty-four (24) hours notice of readiness, unless loading and/or discharging commences sooner whereupon time is to commence.

"7. Also, that for each and every day's detention by default of said party of the second part, or agent, fifteen cents ($0.15) United States Gold per net registered ton per day, day by day, or any part thereof *pro rata*, shall be paid by said party of the second part, or agent, to said party of the first part, or agent. Also, that for each and every day earned by party of the second part, or agent, seven and one-half cents ($0.075) United States Gold per net registered ton per day, day by day, or any part thereof *pro rata,* shall be paid by party of the first part, or agent, to said party of the second part, or agent.

"8. The cargo to be received and delivered alongside, within reach of the steamer's tackle.

"9. Bills of lading to be signed without prejudice to this charter, but at not less than chartered rates. Bills of lading to be signed for definite number of pieces as per P. L. I. B. certificates and mate's receipts to be signed as each parcel loaded and to be surrendered to vessel's agents for regular bills of lading.

"11. This charter being entered into on behalf of other parties, it is hereby mutually agreed that the liability of the freighters and shippers under this

charter shall cease upon the lading of the cargo. Steamer to have a lien upon the cargo for all freight, dead freight and demurrage, and all and every sum, or sums of money which may become due the steamer under this charter. The dangers of the seas, fire and navigation of every nature and kind always mutually excepted."

The evidence tends to show that the ship was detained and did not finish her loading for approximately three days after the lay-days provided in the charter-party. With the exception hereinafter noted, the charterer plaintiff had 300,000 feet B. M. lumber or piling alongside the vessel for defendant, the quality of which complied with the conditions of the charter-party, except that some of the piling was over 60 feet in length and had to be sawed off after being put alongside the vessel, which consumed some time not very accurately estimated in the testimony or otherwise. It is safe and fair to the defendant to say that not over one day of the delay was attributable to any failure on the part of plaintiff to deliver lumber and piling alongside the vessel as stipulated in the charter-party.

The meat of the contention here is this: Defendant claims that the charter-party should be so construed that if from the nature of the cargo more time was consumed than the lay-days therein specified, the charterer should pay demurrage. The plaintiff's contention is that, when it delivered the 300,000 feet per day alongside the vessel as specified in the charter-party, its part of the contract was completed; that, if the ship owner failed to get the cargo on board when so delivered alongside the vessel, he has no right to charge such failure against plaintiff in the form of demurrage.

This is rather an unusual case in this court, as disputes of this character are usually settled in the federal court by justices whose familiarity with maritime law renders them better qualified to pass on questions of this character than the average state judge. The writer can well say in the language of W. S. Gilbert's rhyme of the "Nancy Bell":

"O elderly man, it's little I know
Of the duties of men of the sea."

But we have here a plain contract, which on its face would seem no more difficult of interpretation than a contract for loading and hauling a cord of wood on a wagon, and the writer will proceed to give his interpretation of it. Let us first consider what the freighter plaintiff was required to do. First, he was to furnish a cargo of 3,600,000 feet of sawn lumber or piling of specified length, no piling to exceed 60 feet in length. Second, to pay $15 per thousand for the lumber and $15.50 per thousand for the piling as freight. Third, to furnish P. L. I. B. certificates on completion of loading, such certificates to be accepted by the ship owner. Fourth, to deliver not less than 300,000 feet of cargo each day alongside the ship and within reach of the ship's tackle. If there is anything else that plaintiff was required to do, the performance of which is material to this controversy, we were unable to find it. Now, what was the ship owner to do? First, to receive the lumber and piling above described when delivered alongside the ship; second, to pack, care and stow the same, employing and paying stevedores for that purpose; and third, thereafter to transport the cargo to South America. Both parties understood the nature of the cargo to be shipped. It is frequently

remarked by judges in trials of cases of this character that every shipmaster is presumed to be a stevedore. It is evident that both parties entered into this contract with their eyes open, and with such data as would enable each of them to make a fair estimate of the approximate time it would take to deliver the lumber alongside the ship, and the time which would be required to load it. The provision in the charter-party, "that each and every day's detention by default of said party of the second part, or agent, fifteen cents ($0.15) United States Gold per net registered ton per day, day by day, or any part thereof *pro rata,* shall be paid by said party of the second part, or agent, to said party of the first part or agent," is important in determining the liability in this case, the party of the second part being the plaintiff here.

It is difficult to see how the plaintiff could be in default as to his part of the contract so long as he furnished the 300,000 feet of lumber or piling as therein agreed. In fact, it appears from the evidence here that the bone of contention is the quality and character of the piling as part of the cargo which defendant undertook to receive and stow on the vessel. It is also clear from the testimony and defendant's own letters that had defendant been willing to have work done overtime, that is, in excess of eight hours a day, and to have it done at the rate of one-half time in excess of the regular charge for work by stevedores, the ship would not have been delayed on her voyage. But the shipmaster took the position that the plaintiff should pay for this overtime and, when plaintiff refused to do this, he proceeded to load on regular time and charged plaintiff at the rate of $458.78 per day as demurrage

which would, with some little deduction, amount to the sum sued for in this action.

A multitude of authorities concerning this matter is cited by both parties, some of which, owing to peculiar conditions, or to stipulations in the various charter-parties, are, to say the least, confusing. The general rule is well stated in Carver on Carriage of Goods by Sea (7 ed.), page 828, and we quote from it:

"608. The work of putting the goods into the ship, and of taking them out again, whether under a charter-party, or in a general ship, is in nearly all cases done by the servants of the shipowner. But the duty of bringing the goods to be shipped, and of receiving them at the port of discharge, lies upon the freighter. And in these matters, defaults are apt to occur which lead to detention of the ship, and consequent loss to the shipowner.

"It is therefore, usual in charter-parties, and sometimes in bills of lading, to fix times within which the ship is to be loaded, and discharged; and where that is done, the provision is understood as an undertaking by the freighter that the ship shall be loaded or discharged within the time so fixed. The shipowner must not be in default; he must by his servants do his part of the work of receiving and stowing, or unloading, with diligence and with the proper number of men; but the undertaking as to the time which the loading or discharge shall occupy is given by the freighter, not by the shipowner.

"This is commonly marked in the charter-party by saying that so many days 'are to be allowed the said merchant for loading, etc.' But the effect is the same whether the clause is in that form, or states, generally, that the cargo 'shall be loaded' in so many days. The promise is made by the freighter, for the benefit of the shipowner.

"Exceptional cases, however, occur. A charter-party provided that the cargo should be 'received

from alongside the ship at port of discharge as customary as fast as steamer can deliver in ordinary working hours * * Not less than 100 standards a day loading and discharging, and ten days on demurrage over and above the said laying days at 70£ per day.' The Court of Appeal, affirming WILLS, J., held that the stipulation as to 100 standards a day was for the protection of the charterers; and did not amount to an undertaking by them that the ship should be discharged at that rate."

And further at Section 612, it is said:

"But the freighter is not liable for the delay, if it has been due to a default on the part of the shipowner (v); for example, in refusing to deliver in the proper manner (w); or, in not addressing the ship to the charterer's agent, as agreed, so that notices have not been given to the consignees of cargo (x); or, in failing to bring the ship to the loading place when that could be done (y), or at the time notified to the charterer under the contract (z); or, in failing to have the ship's winches in proper working order (a).

"Nor is the freighter liable for a failure to complete the work of loading or discharging in the agreed time if that has resulted from a refusal of the shipowner to employ enough men to do his part of the work in that time (b).

"Though the stipulation that the ship shall be loaded or discharged in a particular time constitutes a promise by the charterer, still the correlative duty on the shipowner must be proportioned to that on the charterer. When the opportunity for loading or discharging is given, the shipowner ought to do all he reasonably can to get his part of the work done at the agreed rate, whether by employing extra hands, or by working overtime (c).

"In *Hansen* v. *Donaldson* (d) eight days were allowed for discharging; and 'should the vessel be detained above that time' 5£ a day was to be paid. The master did not employ any extra hands in dis-

charging; and it appears that with his crew only he could not put the cargo out in eight days. The crew was a sufficient one for the ship. It was held that the owner could not claim for the detention beyond eight days caused by this failure to put the cargo out.''

■ From a careful examination of such authorities as are available, including those cited by counsel, we cannot construe the failure of the ship to be loaded within the lay-days in this case as a default of the plaintiff. The charter-party, in effect, requires the cargo to be loaded, taken on board the ship and stowed by the ship owner, and at his cost. It is plain in this respect and requires no construction.

■ Evidence was introduced by defendant to the effect that it was the custom of the port of Portland that the freighter should pay for overtime. But the testimony was to the effect that in the dealings with two or three agents of vessels, such claim had been made by the ship owners and paid by freighters, but even if such were the universal custom (which was stoutly denied by witnesses for the plaintiff), we cannot give effect to it in the face of the language of the charter-party, which says the stevedoring shall be at the cost of the ship. There can be no question about the competency or sufficiency of the crew of stevedores employed by the defendant, and if time enough were given them the vessel would have been properly loaded within the lay-days. In fact, the principal contention here is in regard to overtime, and we think that under the plain rules of construction, evidence of a custom that overtime should be at the expense of the freighter should not be allowed in a case where it is stipulated that the

work of lading and stowing shall be at the expense of the ship.

■ This being the case, we will now state the account between plaintiff and defendant. At the rate stipulated in the charter-party, the demurrage would have amounted to $458.78 per day, and if we allow the very limit for defendant's claim for the delay occasioned by plaintiff not having the amount of lumber on hand for a portion of the day, amounting to only a few hours, and the additional delay occasioned by defendant's stevedores having to saw off some of the piling, on account of it being longer than the specifications in the charter, one day is an exceedingly fair concession and this amount should be subtracted from the sum of $1,321.97 retained by the defendant under the pretext of demurrage.

■ It is also argued that the payment in this case was voluntary, but we do not so consider it. The plaintiff had this lumber shipped to a distant port in South America and, if he failed to have a clean bill of lading, there would be difficulties, delays and possibly litigation at the other end of the line. He had $90,000 worth of merchandise afloat in defendant's ship and it was the only reasonable course to pay, under protest, in order to save himself a far greater loss at the other end of the voyage. Defendant had the lumber aboard and the ship afloat, and the conduct of the defendant under such circumstances consisted of such duress as justifies the plaintiff in bringing this action: *Service Lumber Co.* v. *Sumpter Val. Ry. Co.,* 67 Or. 63, 78 (135 Pac. 539); *Pacific Livestock Co.* v. *Cochran,* 73 Or. 417, 422 (144 Pac. 668); *Siverson* v. *Clanton,* 88 Or. 261, 276 (170 Pac. 933, 171 Pac. 1051); *Harris* v. *Cary,* 112 Va. 362, 369 (71 S. E. 551, Ann. Cas. 1913A, p. 1354); 30 Cyc. 1308.

The judgment of the Circuit Court will therefore be reversed and a judgment entered here in favor of plaintiff for the sum of $807.36, and costs of this action. REVERSED. REHEARING DENIED.

BEAN and ROSSMAN, JJ., absent.