In the Matter of a Motion to Compel Arbitration Between HELLENIC LINES, LTD., Petitioner,

and

LOUIS DREYFUS CORPORATION, Respondent.

United States District Court
S. D. New York.

Jan. 21, 1966.

Healy & Baillie, by Nicholas J. Healy and Nicholas J. Healy, Jr., New York City, for petitioner.

Hill, Betts, Yamaoka, Freehill & Longcope, by David I. Gilchrist, New York City, for respondent.

TYLER, District Judge.

Petitioner Hellenic Lines, Ltd. ("Hellenic") has moved to compel arbitration of a commercial dispute with the respondent, Louis Dreyfus Corporation ("Dreyfus"). 9 U.S.C. 4.

The basis of petitioner's motion is a letter agreement signed by Dreyfus on December 24, 1964. Dreyfus concedes execution of this agreement to arbitrate, but sets up the defense of duress or coercion in its answer to the petition. Since this court could not be certain that the issues, especially the defense of duress, were sufficiently developed in the moving papers, this matter was set down for an evidentiary hearing. On the basis of the affidavits and the testimony and exhibits offered at the hearing, the petition to arbitrate must be granted.

On November 9, 1964, Dreyfus in its capacity as an exporter of grain contracted with the Iranian Economic Mission for the sale of approximately 5,000 metric tons of bagged No. 2 hard winter wheat "delivered free alongside buyer's tonnage at Port Covington Grain Elevator, Baltimore". It is said that this sale was made pursuant to the United States Department of Agriculture administered Public Law 480 (7 U.S.C. 1701 et seq.) Foreign Aid Program. Concededly, petitioner was not a party to this agreement.

On or about the same day, however, petitioner as owner of the S. S. Hellenic Star entered into a freight engagement with the Iranian Economic Mission. Under this freight engagement, Hellenic was obliged to load the aforesaid 5,000 tons of wheat from the Port Covington Grain Elevator at its expense and to transport the wheat to Bandar Abbas, Iran. Dreyfus, of course, was not a party to this freight agreement.

Later in the month of November 1964, the New York agent of the Iranian Economic Mission notified Dreyfus that the buyer's tonnage which would call at the Port Covington Grain Elevator to load the wheat would be the vessel S. S. Hellenic Star. Apparently upon the belief that in its previous course of dealing in other transactions Hellenic had been slow in honoring drafts and invoices, Dreyfus wrote Hellenic on December 2 that prepayment of the necessary stevedoring and other elevator charges for the loading of the S. S. Hellenic Star would be required. Such a request for prepayment was, it is true, permitted but not required by the terms of Dreyfus' filed tariff for the grain elevator. Not surprisingly, this request triggered a series of irascible telephone conversations and correspondence between petitioner and Dreyfus concerning the propriety of this request. Nevertheless, several days later Hellenic sent its check of $24,096 in partial compliance with Dreyfus' demand.

The S. S. Hellenic Star arrived at the Port Covington elevator in Baltimore City on December 2 but it was not until December 6 that it obtained a berth to

load. Almost immediately after December 6 there ensued another self-righteous spate of telephone calls and correspondence in which petitioner and respondent exchanged complaints about loading conditions and the like. By way of illustration, it was Dreyfus' claim that the steam winches aboard the vessel were incapable of keeping up with the normal loading process at the elevator, while on the other hand Hellenic charged unwarranted delays in berthing the vessel and the loading once the S. S. Hellenic Star was berthed. Relations deteriorated to the point that on December 15, with approximately 150 tons of wheat still remaining to be loaded, the S. S. Hellenic Star left the Port Covington elevator without tendering to Dreyfus either a mate's receipt or a bill of lading for the cargo.

This development put Dreyfus in a rather precarious position because in order to obtain payment for the grain from the Iranian Mission it was obliged to furnish a clean bill of lading against the letter of credit opened in its favor by the Mission. Accordingly, on December 18, 1964, Dreyfus, having despaired of receiving a bill of lading from petitioner, presented to the latter a clean bill of lading on the bill of lading form usually used by Hellenic with a request that it be immediately executed and delivered.

Several days later, on December 21, instead of presenting a clean bill of lading, petitioner tendered to respondent its form of bill of lading which was duly executed with the usual terms but which also bore on its face the following notation:

"503 (FIVE HUNDRED AND THREE) BAGS SHORTSHIPPED. BAGS FRAIL CONTENTS OF SEVERAL BAGS SPILLING WHILE LOADED. NOT RESPONSIBLE FOR SPILLAGE OF CONTENTS. DETENTION IN LOADING DUE IN THE AMOUNT OF $10,659.12 AS PER ATTACHED STATEMENT. AMOUNT REFUNDABLE TO HELLENIC LINES LIMITED FOR OVER-

TIME AS DEMANDED AND PAID $10,000.00 ALSO

OVERPAYMENT OF STEVEDORING $515.05 ALL OTHER TERMS AND CONDITIONS OF FREIGHT ENGAGEMENT NO. 4575 OF NOV. 9, 1964 TO APPLY."

It scarcely need be said that this limiting language rendered the bill of lading "unclean" and as a result caused Dreyfus considerable unhappiness in view of its aforementioned contractual arrangements with the Iranian Mission.

There followed a series of correspondence and telephone conferences between representatives of the parties in which Dreyfus made various suggestions designed to save petitioner harmless from any responsibility for the short-count or condition of the bags of wheat but at the same time to induce petitioner to sign and deliver a clean bill of lading. Petitioner's representatives, however, rather consistently took the position that Hellenic would issue a clean bill of lading to Dreyfus only upon the condition that Dreyfus agree to arbitrate the various matters which were the subject of its notations on the previously tendered bill of lading described hereinabove.

At the argument and during the course of the evidentiary hearing, counsel for Dreyfus urged that Dreyfus finally executed on December 24 precisely the form of letter insisted upon by petitioner, except for the name of Dreyfus' arbitrator. The testimony of Mr. Van Vort of Dreyfus and several of the exhibits in evidence suggest that the matter was not quite as simple and one-sided as counsel would suggest. Indeed, I am satisfied from the evidence that the parties consumed several days negotiating and drafting the arbitration letter agreement to which they ultimately resorted as a method of resolving their differences. Moreover, not only did Dreyfus execute the letter of December 24 agreeing to arbitrate but also it signed and delivered a letter to petitioner assuming responsibility for any demands by the Iranian Mission against Hellenic for count or spillage of the bags of wheat.

Section 2 of the Federal Arbitration Act (9 U.S.C. 2), of course, gives validity to and requires enforcement of an agreement to arbitrate, "save upon such grounds as exist in law or in equity for the revocation of any contract". Although I have been unable to find any case in this court or indeed in any court in this circuit on the point, it is assumed for the purposes of this motion that a factually supported defense of coercion or duress would be legally sufficient to defeat arbitration under the aforesaid section of the statute. See Kentucky River Mills v. Jackson, 206 F.2d 111, at 120, 47 A.L.R.2d 1331, 6 Cir. 1953; International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local 145 v. Shapiro, 138 Conn. 57, at 63, 82 A.2d 345, at p. 348 (1951).

■ More specifically, of course, respondent argues that under the foregoing facts there was a "duress of goods" which led it to execute the arbitration contract of December 24. See Darling-Singer Lumber Co. v. Oriental Navigation Co., 127 Or. 655, 272 P. 275 (1929). In general, the rule is said to be that where one party has control or possession of the goods of another and refuses to surrender such goods to the owner thereof except upon the latter's compliance with an unlawful demand, a contract made by the owner to emancipate his property is considered as one made under duress and thus avoidable. Weiner v. Tele-King Corporation, 123 N.Y.S.2d 101, Supreme Court, Kings Co., 1953. Accepting this as the applicable rule, I do not agree that Dreyfus fits within its stated confines for at least two reasons.

First, the facts do not support the proposition that Hellenic exacted from Dreyfus compliance with an unlawful demand or condition. Certainly, it is not unlawful to propose a contract to arbitrate a commercial dispute, and I do not understand Dreyfus to make such a ridiculous claim. Indeed, Dreyfus appears to largely gloss over this indispensable ingredient of the doctrine. At one point in its briefs, it seems to suggest that Hellenic's attempted insertion of the quoted limiting language in the bill of lading constituted a violation of applicable provisions of Section 3 of the Carriage of Goods by Sea Act. 46 U.S.C. 1303. But, as petitioner points out, Section 3 sets forth only those bill of lading provisions which are required by the Act; it does not by its terms exclude insertion of other or "nonmandatory" matters in a bill of lading.[1] Dreyfus, apparently none too convinced of the merits of this first argument, next asserts in its briefs that the terms of Hellenic's freight engagement obligated petitioner "to give clean bills of lading * * *" to Dreyfus. Unfortunately, my reading of the rider to the freight engagement fails in fact to reveal any such requirement on Hellenic's part.[2]

Secondly, it cannot be said under the facts of this case that the bill of lading to be furnished by Hellenic constituted "property" of Dreyfus within the aforementioned rule of duress. Dreyfus, of course, argues to the contrary; more particularly, it points to several cases which it says stand for the proposition that " * * * withholding of a proper bill of lading from the rightful owner until an unlawful demand is met constitutes duress". One of the three cases cited for this proposition, San Antonio & A and P Ry. Co. v. Barnett, 27 S.W. 676 (Ct. Civ. Appeals, Texas, 1894), is so clearly inapposite to the case at bar as to warrant no discussion. The other two are closer to the present problem but nonetheless clearly distinguishable.

---

1. Indeed, a good argument could be made for the proposition that the statute affirmatively permits a carrier to refuse to state or show conditions or quantities which it believes to be inaccurate. See 46 U.S.C. 1303(3) (c).

2. See Paragraph 3 of rider: "Original Bills of Lading are to be surrendered to the Supplier, Louis Dreyfus Corporation, upon Completion of loading * * *."

In Darling-Singer Lumber Co. v. Oriental Navigation Co., supra, the vessel owner withheld from shipper a clean bill of lading until payment of a disputed demurrage charge was exacted from the shipper. Yet the case of duress as urged by the shipper largely turned upon the fact that the vessel owner had $90,000 worth of shipper's lumber aboard the vessel: "Defendant (vessel owner) had the lumber aboard and the ship afloat, and the conduct of the defendant under such circumstances consisted of such duress as justifies the plaintiff (shipper) in bringing this action". 127 Or. at 672, 272 P. at 278. In short, the property in question was not the bill of lading involved—it was the lumber cargo which was shipper's property at the mercy of the shipowner and used by the latter as a lever to extract from the shipper the disputed demurrage charges.

Respondent's second case, Cowley v. R. Fabien & Co., 204 N.Y. 566, 97 N.E. 458 (1912), is similarly distinguishable. There the court turned its holding of duress upon the express finding that defendant, as agent, had illegally obtained possession of plaintiff's cargo by means of a breach of his agency contract with plaintiff. In other words, defendant-agent's wrongful possession of plaintiff's property put him in the position to withhold a bill or bills of lading until plaintiff agreed to pay him certain unjustified excess charges.

■■ In sum, Dreyfus has made no satisfactory showing, either in fact or in law, of the requisite duress to defeat its plain contract to arbitrate. Quite evidently, Hellenic did not possess or control any "property" of Dreyfus which it unlawfully refused to relinquish. Hellenic had claims—whether justified or not is presently immaterial—against Dreyfus for alleged short outturn of bags, spillage, improper detention of the vessel in loading and excessive overtime and other stevedoring charges. Dreyfus disputed these claims and, for reasons arising out of its separate contract with the Iranian Economic Mission, needed a clean bill of lading—i. e. one which did not reflect the claims against it by Hellenic or anyone else. As a result, the parties bargained and agreed to arbitrate their differences. Hellenic gave to Dreyfus by way of consideration its promise to arbitrate and a clean bill of lading. Hellenic received in return from Dreyfus the latter's promise to arbitrate and its commitment to assume responsibility to the Iranian Mission for short count and spillage. Since the mutual promises to arbitrate alone were ample consideration for the agreement, see Robert Laurence Company, Inc. v. Devonshire Fabrics, Inc., 271 F.2d 402, 2 Cir. 1952, and because the facts suggest that Dreyfus, a large company, was substantially in an equal bargaining position with petitioner, it ill behooves Dreyfus to argue that it was the victim of serious economic duress in the classic legal sense.

Indeed, it may be relevant to observe that Dreyfus at the time of its agreement and for many weeks thereafter did not conceive itself to have been coerced into execution of its promise to arbitrate. In early 1965, Dreyfus proceeded to the appointment of its arbitrator; also, a Dreyfus representative attended an arbitration hearing on or about March 11, 1965 after some weeks of conferences with petitioner's counsel regarding designation of the full panel, a proposed submission and other usual procedural details. It was only on March 11, 1965, apparently, that Dreyfus and its lawyers first indicated an intention to resort to the claimed defense of duress.

In the light of the foregoing circumstances, the petition to compel arbitration of Hellenic's claims for detention of the vessel, overpayment of stevedoring charges and related matters is granted. Settle order accordingly.