Argued January 22; reargued September 16; reversed December 6, 1932; rehearing denied January 10, 1933

# HURST *v.* LAKE & CO., INC.

(16 P. (2d) 627)

*R. R. Bullivant,* of Portland (Clark & Clark, of Portland, on the brief), for appellant.

*P. J. Gallagher* and *George B. Guthrie,* both of Portland, for respondent.

ROSSMAN, J. From the portion of the pleadings which we are required to deem true, it appears that March 20, 1930, the plaintiff and the defendant entered into an agreement in writing, a copy of which follows:

"Messrs. Roscoe P. Hurst,       "March 20, 1930.
Yeon Building,
Portland, Oregon.
Dear Sirs:

We confirm our purchase from you today as follows:

| | |
|---|---|
| Buyer: | W. J. Lake & Co., Inc. Seattle, Washington. |
| Commodity: | Horse meat scraps. |
| Quantity: | 350 tons of 2000 lbs. each. |
| Price: | $50.00 per ton f. o. b. cars Portland. |
| Terms of Payment: | Net cash in Portland on delivery with analysis certificate. |
| Time of Shipment: | Prior to April 20th, 1930. |
| Route: | As directed by buyer. |
| Specifications: | Minimum 50% protein, ground and sacked in 100 lb. net each. Additional specifications on supplementary page. |

Yours truly,

| | |
|---|---|
| Accepted by: | W. J. Lake & Company, Inc., |
| Roscoe P. Hurst. | By L. E. Branchflower." |

"Mr. Roscoe P. Hurst,       "March 20, 1930.
Yeon Building,
Portland, Oregon.
Dear Sir:

In case any of the Horse Meat Scraps, covered by our purchase order No. 1352 analyzes less than 50% of protein, it is understood that W. J. Lake & Company, Inc., the buyers, are to receive a discount of $5.00 per ton.

It is further understood that in case the buyer does not take delivery of the entire lot by April 20th, 1930, the seller agrees to carry the stock one (1) month more for 50c per ton additional.

The Northwest Testing Laboratories are to instruct the warehouse in the loading and are to furnish analysis certificates, at the buyer's expense. In case of an analysis dispute findings of a referee (sic) chemist, who shall be mutually agreed upon, shall be final.

Yours very truly,

W. J. Lake & Co., Inc.,
(Signed) L. E. Branchflower,
LEB:G            L. E. Branchflower.
Accepted by:
(Signed) Roscoe P. Hurst.''

Pursuant to the contract, the plaintiff delivered to the defendant 349.25 tons of horse meat scraps which contained the following percentages of protein, and for which the defendant paid the following sums of money: 180 tons contained an excess of 50 per cent protein, and the defendant paid for it $50 per ton; 29.25 tons contained 48.66 per cent protein, and the defendant paid therefor $45 per ton; 140 tons contained protein varying from 49.53 per cent to 49.96 per cent for which the defendant paid $45 per ton. The following allegation of the complaint we are required to deem true:

''That at the time the written contract heretofore referred to for the sale of horse meat scraps was entered into on or about the 20th day of March, 1930, both plaintiff and defendant then were, and for some time prior thereto had been, engaged in the business of buying and selling horse meat scraps; that at the time said contract was entered into there was a custom and usage of trade in said business well known to both plaintiff and defendant as to the meaning of the terms 'minimum 50 per cent protein' and 'less than 50 per cent protein' used in the agreement be-

tween plaintiff and defendant. That by virtue of said custom so prevailing in said business of buying and selling horse meat scraps it was well known and understood among all members of the trade, including both plaintiff and defendant, that the terms 'minimum 50 per cent protein' and 'less than 50 per cent protein' when used in a contract for the sale of horse meat scraps with reference to a test of its protein content, meant that a protein content of not less than 49.5 per cent was equal to and the same as a content of 50 per cent protein. That it was further a part of said custom that where said terms 'minimum 50 per cent protein' and 'less than 50 per cent protein' should be used in a contract of sale it was and is the duty of the buyer to accept all horse meat scraps and pay for the same at the rate provided for a product which would test a minimum of 50 per cent even though the chemical analysis of the product should show that the horse meat scraps actually should test as low as 49.5 per cent protein content. That said custom in all its particulars was well known to both plaintiff and defendant and entered into and formed a part of the contract between plaintiff and defendant.

"That the said terms 'minimum 50 per cent protein' and 'less than 50 per cent protein' as used in said contract between plaintiff and defendant were known, understood and used in said contract by both plaintiff and defendant to have the meaning and significance given to said terms by the custom and usage heretofore alleged; that it was the intention of both the plaintiff and defendant that the said terms as used in said contract should mean that the defendant was and should be required to pay the plaintiff at the 50 per cent protein content rate for all meat scraps delivered by plaintiff to defendant which should test as low as 49.5 per cent protein content."

Based upon the contention that the above-quoted portion of the complaint, admitted as true by the defendant, shows that the 140 tons with a protein content of 49.53 per cent to 49.96 per cent should have been

regarded as within the 50 per cent protein classification, the plaintiff argues that the circuit court erred when it sustained the defendant's motion for judgment on the pleadings.

It will be observed from the foregoing (1) that there is a group of dealers who trade in the commodity known as horse meat scraps; (2) that both plaintiff and defendant are members of that group; (3) that the terms "minimum 50 per cent protein" and "less than 50 per cent protein" are trade terms to which the group has attached meanings different from their common ones; (4) that this usage, prevalent among this group, demanded that whenever those terms appeared in a contract for the sale of horse meat scraps it became the duty of the buyer to accept all scraps containing 49.5 per cent protein or more, and to pay for them at the rate provided for scraps containing full 50 per cent protein; and (5) that the defendant was aware of all of the foregoing when it attached its signature to the aforementioned contract.

■ The flexibility of or multiplicity in the meaning of words is the principle source of difficulty in the interpretation of language. Words are the conduits by which thoughts are communicated, yet scarcely any of them have such a fixed and single meaning that they are incapable of denoting more than one thought. In addition to the multiplicity in meaning of words set forth in the dictionaries there are the meanings imparted to them by trade customs, local uses, dialects, telegraphic codes, etc. One meaning crowds a word full of significance, while another almost empties the utterance of any import. The various groups above indicated are constantly amplifying our language; in fact, they are developing what may be called languages of their own. Thus one is justified in saying that the lan-

guage of the dictionaries is not the only language spoken in America. For instance, the word "thousand" as commonly used has a very specific meaning; it denotes ten hundreds or fifty scores, but the language of the various trades and localities has assigned to it meanings quite different from that just mentioned. Thus in the bricklaying trade a contract which fixes the bricklayer's compensation at "$5.25 a thousand" does not contemplate that he need lay actually one thousand bricks in order to earn $5.25, but that he should build a wall of a certain size: *Brunold v. Glasser,* 25 Misc. 285 (52 N. Y. S. 1021); *Walker v. Syms,* 118 Mich. 183 (76 N. W. 320). In the lumber industry a contract requiring the delivery of 4,000 shingles will be fulfilled by the delivery of only 2,500 when it appears that by trade custom two packs of a certain size are regarded as 1,000 shingles and that, hence, the delivery of eight packs fulfills the contract, even though they contain only 2,500 shingles by actual count: *Soutier v. Kellerman,* 18 Mo. 509. And where the custom of a locality considers 100 dozen as constituting a thousand, one who has 19,200 rabbits upon a warren under an agreement for their sale at the price of 60 pounds for each thousand rabbits will be paid for only 16,000 rabbits: *Smith v. Wilson,* 3 Barn. & Adol. 728. Numerous other instances could readily be cited showing the manner in which the meaning of words has been contracted, expanded or otherwise altered by local usage, trade custom, dialect influence, code agreement, etc. In fact, it is no novelty to find legislative enactments preceded by glossaries or brief dictionaries defining the meaning of the words employed in the act. Technical treaties dealing with aeronautics, the radio, engineering, etc., generally contain similar glossaries defining the meaning of many of the words

employed by the craft. A glance at these glossaries readily shows that the different sciences and trades, in addition to coining words of their own, appropriate common words and assign to them new meanings. Thus it must be evident that one cannot understand accurately the language of such sciences and trades without knowing the peculiar meaning attached to the words which they use. It is said that a court in construing the language of the parties must put itself into the shoes of the parties. That alone would not suffice; it must also adopt their vernacular.

Wigmore on Evidence (2d Ed.), § 2460, points out that the interpretation of language may be thus approached:

"The standard of the community, or popular standard, meaning the common and normal sense of words; the local standard including the special usages of a religious sect, a body of traders, an alien population or a local dialect; the mutual standard covering those meanings which are peculiar to both or all the parties to a transaction but shared in common by them; and the individual standard of one party to an act, as differing from that of the other party or parties, if any."

After Dean Wigmore has reviewed at length the overthrow of what he calls the traditional rule which insists that the meaning of all words is rigid and inflexible, and the development of what he terms the liberal rule which recognizes, to some extent at least, the four aforementioned standards of interpretation, he continues (§ 2463):

"The liberal rule, on the other hand, is today conceded practically everywhere, to permit resort in any case to the usage of a trade or locality, no matter how plain the apparent sense of the word to the ordinary

reader; and some of the extreme instances are persuasive to demonstrate the fallacy of ignoring the purely relative meaning of words and the injustice of attempting to enforce a supposed rigid standard.''

From Williston on Contracts, § 650, we quote:

''Though Professor Thayer has said that 'In contracts it was always recognized that familiar words may have different meanings in different places, so that ''every bargain as to such a thing shall have relation to the custom of the country where it is made,'' ' it may be doubted how far it was allowable under early law to show that a word in a written contract (or perhaps in an oral agreement) having a clear and fixed ordinary meaning bore a meaning contrary to its usual significance, if nothing in the context showed that a particular meaning was intended. But there are now numerous decisions (not all of them of recent date) where words with a clear, normal meaning have been shown by usage to bear a meaning which nothing in the context would suggest. This is not only true of technical terms, but of language which, at least on its face, has no peculiar or technical significance; though even today it is still occasionally said by courts that usage cannot control words having 'a definite legal meaning;' or cannot be used to interpret a contract unless there is an uncertainty on the face of the instrument.''

From 3 Starkie on Evidence 1033, we quote:

''Where terms are used which are known and understood by a particular class of persons, in a certain special and peculiar sense, evidence to that effect is admissible for the purpose of applying the instrument to its proper subject-matter; and the case seems to fall within the same consideration as if the parties in framing their contract had made use of a foreign language which the courts are not bound to understand * * *. Conformably with these principles, the courts have long allowed mercantile instruments to be ex-

pounded according to the custom of merchants, who have a style and language peculiar to themselves, of which usage and custom are the legitimate interpreters.''

From Page on Contracts, § 2028, we quote:
''Usages, such as those of a trade, may be resorted to to show the special meanings of words.''

From 17 C. J., Customs and Usages, p. 499, § 62, we quote:
''Words technical or ambiguous on their face, or foreign or peculiar to the sciences or the arts, or to particular trades, professions, occupations or localities, are explainable where they are employed in written instruments by parol evidence of usage.''

See to the same effect 27 R. C. L., Usages and Customs, p. 170, § 19, and 27 Albany Law Journal, p. 464 (reviewing many authorities) and *Electric Reduction Co. v. Colonial Steel Co.,* 276 Pa. 181 (120 Atl. 166) (reviewing many authorities).

■ The defendant cites numerous cases in many of which the courts held that when a contract is expressed in language which is not ambiguous upon its face the court will receive no evidence of usage but will place upon the words of the parties their common meaning; in other words, in those decisions the courts ran the words of the parties through a judicial sieve whose meshes were incapable of retaining anything but the common meaning of the words, and which permitted the meaning which the parties had placed upon them to run away as waste material. Surely those courts did not believe that words are always used in their orthodox sense. The rulings must have been persuaded by other considerations. The rule which rejects evidence of custom has the advantage of simplicity; it protects the writing from attack by some occasional individual

who will seek to employ perjured testimony in proof of alleged custom; and if one can believe that the parol evidence rule is violated when common meaning is rejected in favor of special meaning, then the above rule serves the purpose of the parol evidence rule. Without setting forth the manner in which we came to our conclusion, we state that none of these reasons appeals to us as sufficient to exclude evidence of custom and assign to the words their common meaning only, even though the instrument. is nonambiguous upon its face. The defendant argues that this court has held that custom or usage cannot be resorted to in the interpretation of the meaning of an instrument where no ambiguity appears upon its face, and cites in support of his contention *Williams v. Ledbetter,* 132 Or. 145 (285 P. 214); *Darling-Singer Lbr. Co. v. Oriental Navigation Co.,* 127 Or. 655 (259 P. 420, 272 P. 275); *Interior Warehouse Co. v. Dunn,* 80 Or. 528 (157 P. 806); *Oregon Fisheries Co. v. Elmore Packing Co.,* 69 Or. 340 (138 P. 862); *Barnard & Bunker v. Houser,* 68 Or. 240 (137 P. 227); *Savage v. Salem Mills Co.,* 48 Or. 1, (85 P. 69, 10 Ann. Cas. 1065); *Abraham v. Oregon & California R. R. Co.,* 37 Or. 495 (60 P. 899, 64 L. R. A. 391, 82 Am. St. Rep. 779), and *Holmes v. Whitaker,* 23 Or. 319 (31 P. 705). It must be admitted that language can be found in some of these decisions which lends weight to his argument. But a reading of these cases will disclose that in all of them, with the exception of *Abraham v. Oregon & California R. R. Co.,* the party was not resorting to custom for the purpose of interpreting the language of the instrument, but for the purpose of annexing or engrafting on to the contract an additional term; in other words, he sought to prove that the written instrument did not embody the entire agreement. Such a con-

tention invoked a principle quite different from the one with which we are now concerned. For comment see Wigmore on Evidence (2d Ed.) § 2440. In *Abraham v. Oregon & California R. R. Co.,* the decision does not mention custom. The appellant in that case sought to prove that he and the party with whom he dealt had placed upon one of the terms of the instrument a mutual meaning distinct from its normal one.

Section 9-217, Oregon Code 1930, provides: "The terms of a writing are presumed to have been used in their primary and general acceptation, but evidence is nevertheless admissible that they have a technical, local, or otherwise peculiar signification, and were so used and understood in the particular instance, in which case the agreement shall be construed accordingly." In *McCulsky v. Klosterman,* 20 Or. 108 (25 P. 366, 10 L. R. A. 785), this court, after finding that the parties, both of whom belonged to the same business group, had used the term "outstanding account" in a contract as a trade term, interpreted its meaning according to the standards of the trade. In *McDonald v. Supple,* 96 Or. 486 (190 P. 315), Mr. Justice BEAN, on behalf of this court, stated the rule governing trade terms and technical words in substantially the language of the statute. California has a statute similar to our above enactment (see Fairall's Code of Civil Procedure, § 1861, or Kerr's Cyclopedic Codes of California, § 1861) and the California courts have cited it as authority for the holding that a party may not only show that a term possesses a trade or local meaning but also that it was used in that manner: *Higgins v. California Petroleum Etc. Co.,* 120 Cal. 629 (52 P. 1080), and *County of Alameda v. Garrison,* 108 Cal. App. 122 (291 P. 464). In the Higgins case the court held that evidence was admissible to show that the term "gross

ton'' was a trade term to which dealers in petroleum had attached the meaning of 2,240 pounds, even though a statute of California defined a ton as ''twenty-hundred weight.'' California also has a statute (Fairall's Code of Civil Procedure, § 1870, subd. 12, and Kerr's Cyclopedic Codes of California, § 1870, subd. 12) similar to section 9-226, subd. 12, Oregon Code 1930, to which the defendant has called our attention, but that enactment did not prevent the court from the liberal holding indicated by the two above decisions. Section 9-226, subd. 12, Oregon Code 1930, reads as follows:

''In conformity with the preceding provisions, evidence may be given on the trial, of the following facts: * * * Usage, to explain the true character of an act, contract, or instrument, where such true character is not otherwise plain; but usage is never admissible except as a means of interpretation; * * *.''

Without setting forth herein our review of the many authorities cited in the briefs, all of which we have read with care, we state our conclusion that members of a trade or business group who have employed in their contracts trade terms are entitled to prove that fact in their litigation, and show the meaning of those terms to assist the court in the interpretation of their language.

■ Finally, it is suggested that the employment of the terms ''minimum 50 per cent protein'' and ''less than 50 per cent of protein'' indicates that the parties rejected the mercantile custom in effecting their contract. It will be recalled that under the state of the record we are compelled to regard these two terms as trade terms possessed of a special significance. We believe that it is safe to assume, in the absence of evidence to the contrary, that when tradesmen employ trade terms they attach to them their trade signifi-

cance. If, when they write their trade terms into their contracts, they mean to strip the terms of their special significance and demote them to their common import, it would seem reasonable to believe that they would so state in their agreement. Otherwise, they would refrain from using the trade term and express themselves in other language. We quote from *Nicoll v. Pittsvein Coal Co.*, 269 Fed. 968: "Indeed, when tradesmen say or write anything, they are perhaps without present thought on the subject, writing on top of a mass of habits or usages which they take as a matter of course. So (with Professor Williston) we think that anyone contracting with knowledge of a usage will naturally say nothing about the matter unless desirous of excluding its operation; if he does wish to exclude he will say so in express terms. Williston, Contracts, § 653." Nothing in the contract repels the meaning assigned by the trade to the two above terms unless the terms themselves reject it. But if these terms repel the meaning which usage has attached to them, then every trade term would deny its own meaning. We reject this contention as being without merit. We have considered all other contentions presented by the respondent but have found no merit in them.

It follows that, in our opinion, the circuit court erred when it sustained the defendant's motion for judgment on the pleadings.

Reversed.

Brown, Belt, Campbell and Kelly, JJ., concur.

Rand, J., concurs in the result.

Bean, C. J., dissents.