**GHOLSON, BYARS AND HOLMES CON-STRUCTION COMPANY**

v.

**The UNITED STATES.**

No. 349–63.

United States Court of Claims.

Oct. 15, 1965.

Peter T. Posmantur, New York City, for plaintiff, Allen, Drexler & Posmantur, New York City, of counsel.

Sheldon J. Wolfe, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

PER CURIAM.

This case was referred pursuant to Rule 57(a) to Trial Commissioner Herbert N. Maletz, with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on June 29, 1965. Plaintiff filed no exceptions or brief to the report. On July 28, 1965, defendant filed a brief excepting in part to the commissioner's opinion and recommendation for conclusions of law. On August 16, 1965, plaintiff filed remarks on commissioner's report under Rule 58 which, by order of August 19, 1965, were allowed as a state-ment submitted and filed pursuant to Rule 62. The case is now submitted to the court without oral argument as provided by Rule 62.

The court notes that defendant's brief filed July 28, 1965, asserts that defendant does not except to that portion of the commissioner's opinion and conclusions of law which deals with plaintiff's claim for additional costs incurred in the washing of plaster surfaces. Since the court agrees with the commissioner's findings, his opinion and his recommended conclusions of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Plaintiff is therefore entitled to judgment under the "Changes" clause of the contract for the additional expenses incurred in washing with soap and water those plaster surfaces which could have been cleaned by wiping to accomplish the results required by the specifications and for the expenses incurred in painting those surfaces which had a baked enamel or hammertone finish. The amount of recovery will be determined pursuant to Rule 47(c). Such facts as are necessary to the decision of the case are found in the commissioner's opinion.

OPINION OF COMMISSIONER

In June 1957, plaintiff entered into a contract with the General Services Administration (GSA) to furnish all labor and materials and perform all work required for lighting and painting improvements at the United States Post Office and Courthouse in Pittsburgh, Pennsylvania. It asserts three claims totaling $14,724.52 on behalf of its painting subcontractor, Charles Picoult, for work performed allegedly beyond the scope of the contract. The first claim in the amount of $8,250 arises from an alleged demand by a GSA representative that the subcontractor wash down all plaster wall and ceiling surfaces with soap and water before painting them. The second and third claims amounting to $6,350.74 and $123.78, respectively, arise from defendant's directions requiring painting of (i) metal doors and counters, including par-

titions, having a baked enamel finish and (ii) air units having a hammertone finish, which work, plaintiff says, was not required by the contract specifications. The claims were denied by the contracting officer, whose decision was affirmed on an appeal under the disputes clause by the GSA Board of Contract Appeals, and the case is here on an Assignment of Errors filed by plaintiff challenging the Board's decision as arbitrary, capricious, contrary to the evidence and erroneous in law. The task is to review the administrative record before the Board to determine (1) whether its factual determinations meet the standards of the Wunderlich Act, 41 U.S.C. § 321, and (2) whether its interpretation of the contract specifications is correct.[1] It is in this context that each of these claims is considered below.

### Claim 1—Washing of Wall and Ceiling Surfaces

Paragraph 5–18 of the specifications provided in part:

> PREPARATION OF SURFACES, ETC.—Surfaces specified to be painted or enameled shall be clean and dry and free from dust, grease, soot, etc., at the time any coating is applied. * * * The cleaning shall be undertaken as a separate operation and shall be completed in its entirety in the areas designated by Government Representative. Surfaces that are required to be cleaned shall be inspected and approved by Government Representative before any painting of surfaces is begun. * * *

On December 11, 1957, the painting subcontractor addressed a letter to plaintiff (which the latter forwarded on the same day to the contracting officer for decision) stating that the GSA construction engineer at the job site interpreted paragraph 5–18 as requiring washing of plaster surfaces before repainting. The subcontractor said he disagreed with this interpretation because the provision did not cite any specific method by which a cleaning operation was to be conducted but merely specified that the surface required to be painted or enameled "shall be clean and dry and free from dust, grease, soot, etc." Accordingly, the subcontractor continued, if a plaster area to be repainted was in such condition, no cleaning would be required and he could proceed with the painting. On the other hand, he declared, if dust, grease or soot was present in a particular plaster area, it was up to him to remove the condition by a cleaning method of his own choosing. The subcontractor added that it was not the intention of the specifications that plaster surfaces be washed as evidenced by the fact that where washing was required it was stated in plain terms, as in paragraph 5–46, which specifically provided that all previously varnished woodwork specified to be revarnished shall be "cleaned with an approved wash."

On December 16, 1957, the GSA construction engineer wrote the contracting officer stating that paragraph 5–18 of the specifications called for all surfaces to be cleaned before painting and that surfaces were to be "clean and dry and free from dust, grease, soot, etc." He said that certain areas were brushed with a mop but the grease, soot, etc. remained on the wall and approval was not given until the grease, soot, etc. was removed. He indicated that it was up to the contractor to use any method he desired, within good practice, to clean walls as required by the specifications

---

[1]. The interpretation of contract specifications is a question of law as to which the prior Board's determination is not binding. See 41 U.S.C. § 322; e.g., Hol-Gar Manufacturing Corp. v. United States, Ct.Cl., 351 F.2d 972, decided January 22, 1965; C. J. Lagenfelder & Son, Inc. v. United States, Ct.Cl., 341 F.2d 600, 609, decided February 19, 1965. Since complete administrative relief was available and the Board has decided the legal question, neither side is entitled to a *de novo* trial on the factual determinations made by the Board directly related to its decision on the legal issue. Morrison-Knudsen Co. v. United States, Ct.Cl., 345 F.2d 833, decided May 14, 1965.

to meet inspection approval by the government representative before any painting was done, adding that the surfaces submitted for inspection were not approved because soot, grease, etc. was not removed and that the contractor found it necessary to remove grease, soot, etc., after which approval was given to paint the surfaces. He stated that the "Contractor's statement that Construction Engineer required plaster surface to be washed prior to painting is in error, however, surfaces must be cleaned to the approval of the Government Representative before it is painted." [2]

On January 29, 1958, the contracting officer replied to plaintiff's letter of December 11, 1957, and stated that while paragraph 5–18 did not specifically mention washing, it required removal of dust, grease, soot, etc. prior to application of paint, and also included a provision that "Surfaces that are required to be cleaned shall be inspected and approved by a Government Representative before any painting of surfaces is begun." "Accordingly", the contracting officer wrote, "all surfaces to be treated must be cleaned by any appropriate means to the entire satisfaction of the Engineer-in-Charge of the work."

On April 29, 1958, plaintiff forwarded to the contracting officer a letter dated April 21, 1958, which it had received from the subcontractor claiming entitlement to additional costs incurred as a result of allegedly being instructed to wash plaster surfaces rather than being permitted to use a method of his own choosing. The subcontractor's letter to plaintiff stated in part:

As you well know, * * * the Construction Engineer, despite my protests, insisted that the cleaning of plaster be done through the washing method only because no other method would be acceptable to him. By his instructions, he therefore compelled me to use a cleaning method that was far more costly than other accepted methods by which the plaster surfaces could have been cleaned to meet specification requirements.

The Construction Engineer, in fact, acted contrary to the specifications because, insofar as the cleaning was concerned, his authority was confined to inspecting and either approving or rejecting the final result of the cleaning method chosen by me. He had no authority to dictate the cleaning method to be used. By ordering me to wash, he exceeded his authority and involved me in additional expense.

In estimating the work on this subcontract, I allowed ½ cent per sq. ft. for cleaning, which could have been done mainly with dust brushes and dry rags, except for some minor surface areas, particularly above radiators, which would have been washed. By washing all the sur-

---

2. Neither in the briefs before the Board nor in its opinion and decision was reference made to this letter from the GSA engineer to his superior and plaintiff insists that its files on the matter do not contain a copy of it. Defendant, however, has filed a recently prepared affidavit of a GSA attorney stating that the Board's records were delivered to him after commencement of the present litigation and that this letter "was a part of the official correspondence file of the * * * Board * * *." Plaintiff in reply has filed an affidavit from its counsel before the Board stating that in 1962 he reviewed the files before the Board on the appeal; that to the best of his knowledge this communication was not in the files; that his entire presentation to the Board was made without regard to or knowledge of this letter; and that had he had knowledge thereof, he would have obviously insisted upon an oral hearing rather than have submitted the matter to the Board without hearing. See footnote 4, infra. Plaintiff has also filed a second affidavit from the subcontractor's brother stating that he also had reviewed the files before the Board on appeal and did not see the communication. While the question is not free from doubt, in order to avoid further proceedings on a controversy that is now almost eight years old, the letter will be considered here as part of the administrative record before the Board but not known to the plaintiff until the institution of the present suit.

faces as ordered by the Construction Engineer, my payroll and material records indicate that the cost averaged 3¢ per sq. ft. Based on a total area of 300,000 sq. ft., my cost should not have exceeded 1500.00 dollars. As a result of being compelled to confine the cleaning to washing only, my cost reached a total of 9,000.00 dollars.

On September 23, 1958, plaintiff, on behalf of its subcontractor, filed a claim with the contracting officer in the amount of $8,250[3] for the washing of the plaster surfaces, which was denied on May 28, 1959, on the basis of the reasons given in the latter's previous letter of January 29, 1958. Also denied at the same time were plaintiff's other two claims, filed on September 23, 1958, involving painting of baked enamel and hammerstone finished surfaces. Plaintiff appealed from these adverse decisions on June 5, 1959, but it was not until January 22, 1962—some 2½ years later—that the agency referred the appeal to the Board. Thereafter, on August 1, 1962, the contracting officer made the following findings of fact for inclusion in the appeals file:

Paragraph 5–18 calls for all surfaces to be clean, dry and free from dust, grease, soot, etc., before being painted. Moreover, it includes the following: "Surfaces that are required to be cleaned shall be inspected and approved by a Government Representative before any painting of surfaces is begun." Contractor's statement that the Construction Engineer required that the plaster surfaces should be washed prior to painting is in error. Regardless of which method the contractor used to clean the plaster surfaces, it was the responsibility of the Government Representative to decide whether the work had been properly performed as required by the specifications.

In addition to the foregoing records, all of which were before the Board,[4] plaintiff submitted separate affidavits of the subcontractor and two of his employees, while the defendant submitted two written statements prepared jointly by two GSA engineers who had been at the job site. The subcontractor's affidavit, dated October 12, 1962, stated that before commencing the painting work, he met with the GSA engineer in charge of the work in regard to the manner in which the painting work was to be done; that at the latter's direction a room was selected in the Post Office and Courthouse which was to act as a guide for the entire project;[5] and that the engineer requested the subcontractor to prepare and paint the room and told the subcontractor that his acceptance or rejection of the cleaning and painting method of the various areas of the building would be based on his instructions in regard to the sample room. The affidavit stated that a sample room was selected by the engineer and the subcontractor's employees prepared the room with drop cloths and ladders and proceeded to wash certain wall areas bearing grease and soot with soap and water; that other areas in the room that

3. Of this amount, $7,500 was for claimed additional costs and $750.00 for the contractor's commission.

4. Neither party had requested a hearing, and the controversy was submitted to the Board under its rule 8, which provided that "If neither party to the dispute requests a hearing, and the Board does not require one, the decision will be made upon the available records and such additional evidence and argument as may be furnished by the parties involved." The rule further provided that "If such additional evidence or argument is furnished by one of the parties involved, the Board will make this evidence available to the other party * * * [who] may then present argument in rebuttal. * * *"

5. Paragraph 5–10 of the specifications provided: "Before proceeding with interior painting, one room, space or item as directed of each color scheme required showing selected colors, finished textures, materials and workmanship shall be completed as specified. After approval, these samples, spaces or items shall serve as a standard for similar work throughout the building."

did not have grease and soot were cleaned by the use of dry cloths; and that by the use of dry cloths the loose dirt was immediately removed. The affidavit stated further that the GSA engineer refused to accept that method of cleaning and directed the subcontractor to instruct his employees that the cleaning was to be done with soap and water only, regardless of whether the walls and ceilings were covered with grease and soot or not, and that the engineer instructed the subcontractor never to attempt to clean the room with dry cloths. The subcontractor's affidavit added that the engineer informed him that he would reject any area which had a first coat of paint unless there was a record on file that the area had first been washed with soap and water before the first coat of paint was applied; that in the presence of the subcontractor the engineer also instructed the building engineer that the subcontractor and his employees were required to wash all areas to be painted with soap and water before applying the paint; and that in the event the GSA engineer in charge of the work was not in the building at the time the subcontractor was ready to apply paint, the building engineer and his subordinates should first inspect the area to be painted to determine first that the area had been washed with soap and water. The affidavit declared that during the time the painting was in process in the building, the GSA engineer in charge of the work would make a tour of the building with one of the general contractors to make sure that the painters at all times had soap and water with them for cleaning purposes, and at times would double check to make certain that the area had been cleaned with soap and water by dipping a sponge in the soap container and applying it to an area already cleaned to make certain that soap had been used in cleaning the area to be painted.

In reply the defendant submitted a memorandum dated December 5, 1962, signed jointly by two GSA engineers who had been at the work project, stating that the plaintiff was not told it must prepare the walls for repainting by washing them, but was told it must clean the surfaces by any method that would accomplish the results required by the specifications. In another memorandum, dated December 20, 1962, signed by these two engineers, it was stated that the painting subcontractor asked what condition the walls should be in to be acceptable and that he was told that paragraph 5–10 of the specifications required that one room was to be completed, as specified, as a sample for color, finish, texture and workmanship; that the painter went into the specified room and ran a dry mop over a section of the wall; that this removed nothing but loose dust and he was told that dusting was not acceptable; that the dusting did not remove grease, soot, etc.; and that approval could not be given until grease, soot, etc. was removed. The memorandum stated that it was up to the contractor to use any method he desired within good practice to clean surfaces as required by the specifications to meet inspection approval of government representatives before any painting was done; and that the contractor "then cleaned the surfaces with a detergent which did remove grease, soot, etc. and approval was given to paint surfaces." The memorandum stated further that the contractor "without being directed or requested by the Government Representative chose this method for cleaning the surfaces"; that the "Painting Contractor was given approval on using this method of cleaning surfaces and cleaned surfaces were approved by the Government Representative". The GSA engineers also stated in their memorandum that due to conditions found by the GSA engineers where the painting contractor painted surfaces that were not cleaned before they were painted as required by paragraph 5–18, the engineer told the painting contractor that no area was to be painted until the cleaned surfaces were approved; that the building superintendent was present at this time and understood the condition surfaces should be in before painting; and that if for

any reason the construction engineer was away from the site or if work was done off -hours, the painting contractor was instructed to get approval of cleaned surfaces from the building superintendent before painting.

In response, plaintiff submitted an affidavit of the subcontractor's foreman on the job, stating that after he started on the job, the GSA engineer continuously directed that he have his men prepare all walls to be painted by washing them with soap and water and refused to allow the preparation of any walls or portions thereof, for painting, by dry cleaning or any other method than by washing with soap and water even those areas which, in the affiant's opinion, as an experienced painter, could be properly prepared for painting by cleaning with dry cloths. The affiant stated that in the buildings that were being painted there were some areas that required preparation for painting by washing with soap and water. The affiant further said that at the time he was on the job as foreman he had had 25 years' experience as a painter; that he had no personal interest in the claim; and that he had not been employed by the subcontractor for at least two years preceding the making of the affidavit.

Plaintiff also submitted an affidavit by one of the painters who worked on the job from December 1957 until its completion in August 1958. He stated that the GSA engineer or his representative would refuse to accept as properly prepared for painting walls or areas of walls or ceilings which had been properly prepared by cleaning with a dry cloth and would instruct that preparation for painting be made by washing the walls with soap and water. He stated that this was a continuous practice; that, for example, when furniture, such as bookcases, would be moved from the walls that would leave areas that could be readily prepared for painting by cleaning with a dry cloth, the GSA engineer would still instruct the men to prepare the areas by washing with soap and water, irrespective of the areas which were flat or semi-gloss; and that so far as he could recall, all wall areas were semi-gloss.

Against this background, the Board observed that it was faced with a conflict in the record evidence as to whether, contrary to the specifications, the government representative directed that the surfaces of the walls be cleaned by washing, and thereby required extra work for which plaintiff should be paid. It made no finding on that issue but concluded instead that plaintiff had failed to sustain its burden of proving that plaster surfaces were not covered with grease and soot and, thus, did not require washing. More particularly, the Board pointed out that it was left to the discretion of the government representative to decide what areas required cleaning and to determine whether the cleaning of these areas by the plaintiff had made them free of grease and soot; that if plaintiff's cleaning of the designated areas did not result in making them free of "dust, grease, soot, etc.", the government representative had the right to disapprove and to insist that the designated areas be cleaned so as to meet the requirements of the specifications; that it was well known that grease and soot were not removable by dry mopping or by wiping with wet cloths, and that use of soap or detergent or some other method of cleaning was required; that, therefore, it was plaintiff's obligation to remove the same and that if compliance with that obligation required washing, it was the plaintiff's obligation to do what was necessary. The Board declared that nowhere in the record before it did the plaintiff describe the prework condition of the wall surfaces nor assert that they did not have grease and soot on them. On the contrary, the Board said, the subcontractor's foreman stated that there were some areas that required washing with soap and water; and, therefore, even assuming that the government representatives demanded that the plaintiff clean such surfaces with soap and water, there was no evidence presented that such demand was

unreasonable and not required by the condition of the walls. The Board concluded by stating that plaintiff had not sustained its burden and that to sustain such burden, it was required to present more than mere general allegations that the government representative required washing with soap and water regardless of whether the walls were covered with grease and soot.[6]

On the basis of the record before it, it must be concluded that the Board was in error in finding that plaintiff had failed to sustain its burden of showing the pre-work condition of the wall and ceiling surfaces. At the outset it is clear under the specifications that the subcontractor was required to clean wall and ceiling surfaces in the areas designated by the GSA representative before painting them, though he was free to use any method he saw fit for such cleaning provided the surfaces were, subject to inspection and approval of the GSA representative, made clean and dry and free from dust, grease, soot, etc. It is also clear that washing with soap and water was necessary to remove grease or soot, but not necessary in the absence of such condition. Against this background, it is undisputed that the subcontractor did, in fact, wash *all* the wall and ceiling surfaces to be painted—an undertaking which, he insisted, was compelled by the GSA representative despite the fact that some areas allegedly did not require washing, while other areas admittedly did. The amount of the claim not having been decided by the contracting officer or presented to the Board for determination, the issue before the Board was not as to what specific areas of the building needed washing and what areas did not, but rather was whether the subcontractor was compelled by the GSA representative to wash some areas of the building which were not required

under the contract, so as to constitute a constructive change under the "Changes" clause of the contract. Upon a finding by the Board in favor of plaintiff, the question of amount (of money and areas) would have to be determined by the contracting officer on remand. In short, since the proceeding before the Board did not involve amount, it was not necessary for plaintiff, in order to meet its burden of proof on the pre-work condition of the wall and ceiling surfaces, to show the precise areas where washing was unneeded (i. e., areas which were not covered with grease or soot); it was necessary only that plaintiff show that some part of the building did not require washing, which burden, the record demonstrates, plaintiff met by direct and undisputed evidence that various surface areas of the building could have been satisfactorily cleaned by dry wiping rather than washing. Thus, the subcontractor's letter of April 21, 1958 (which was in evidence before the Board and not disputed), pointed out that "in estimating the work under the contract he allowed ½ cent per square foot for cleaning, which could have been done mainly with dust brushes and dry rags, except for some minor surface areas, particularly above radiators, which would have been washed." Similarly, the affidavits of the subcontractor's foreman and one of his painters pointed out (without denial) that there were areas of the plaster surfaces that were properly prepared for painting by dry wiping. Then too, the record as a whole warrants the inference that not every bit of every surface was covered with grease or soot so as to require washing with soap and water.

■ But the fact that plaintiff has demonstrated that some areas did not require washing does not resolve the controversy since the question remains as

---

6. Plaintiff filed a motion for reconsideration on the ground that the decision was contrary to the evidence. At oral argument on the motion, plaintiff requested that the subcontractor be permitted to testify as to the pre-work condition of the walls, which request was denied on the ground that such evidence was available to plaintiff when the dispute was submitted to the Board for decision and did not constitute newly-discovered evidence. The motion for reconsideration was later denied.

to whether the subcontractor voluntarily washed all the plaster surfaces in the building (including those that could have been cleaned by wiping) or whether such undertaking was required by the GSA representative, actually or constructively.[7] As to this, the preponderance of the evidence before the Board supports the conclusion that the subcontractor did not voluntarily wash all the surfaces in question, but that he was required to do so by the GSA representative. For one thing, it will be recalled that the sub-contractor, in his letter of December 11, 1957 (which was written while the work was in progress), complained with specificity that GSA engineer at the job site was requiring him to wash all plaster surfaces. It is not without significance in this context that the contracting officer in his reply of January 29, 1958, did not question the truthfulness of the subcontractor's complaint but merely declared that all surfaces to be treated must be cleaned by any appropriate means to the entire satisfaction of the GSA construction engineer. Later, the subcontractor in his letter of April 21, 1958, claimed entitlement to additional costs for being instructed to wash all plaster surfaces even though some could have been cleaned by wiping. While the contracting officer denied the claim, he did so not on the ground that such instructions had not been issued but for the reason set forth in his previous letter of January 29. Indeed, it was not until August 1, 1962—almost five years after the subcontractor had made his first written complaint that the GSA representative required him to wash all plaster surfaces—that the contracting officer issued a denial of the complaint declaring the "Contractor's statement that

the Construction Engineer required that plaster surfaces should be washed prior to painting is in error." It is true that on December 16, 1957 (while the work was in progress), the GSA representative wrote the contracting officer denying that he had required the subcontractor to wash all plaster surfaces. However, the weight to be given to this inter-office communication is lessened by the fact that prior to institution of suit here, it was never divulged to or known by the plaintiff or the subcontractor, thus depriving them of the opportunity to submit a contemporaneous and more detailed particularization of their complaint. More important, this inter-office communication and the written statements to similar effect by the GSA representatives which were submitted to the Board some years later are outweighed from an evidentiary standpoint by the sworn statements submitted to the Board by the subcontractor, his foreman and a painter on the job. For given the circumstances present here, not only are the statements under oath entitled to more credence than those which were not, there is the additional factor that the foreman and the painter were entirely disinterested parties since they no longer worked for the contractor and had no financial connection of any kind with him. What is more, the GSA representatives' statement to the Board that the subcontractor "without being directed or requested by the Government representative chose this method [of washing with a detergent soap and water] for cleaning the surfaces" seems inherently incredible. In the face of the present record, it simply does not appear reasonable to believe that the subcontractor would have chosen voluntarily to employ the obvious-

---

7. The Board having failed to decide that issue, this court can, under United States v. Carlo Bianchi and Co., 373 U.S. 709, 717. 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963), decide it on the basis of the present Board record in view of the fact that that record is adequate for making a determination at this juncture. See Farnworth & Chambers Co., Inc. v. United States, Ct. Cl., 346 F.2d 577, 579, fn. 4, decided June

11, 1965. Suspension of the case to afford the Board opportunity to make findings on the issue would not serve any useful purpose inasmuch as the record was wholly documentary and the Board would thus not be in any special position to judge credibility. Suspension, moreover, would delay still further a controversy that has already been the subject of inordinate delay.

ly far more expensive method of washing rather than wiping, where washing was not required. Indeed, it would be a rather unusual situation for a contractor voluntarily to do substantially more work than is required by the terms of the contract, thus only to increase his costs.

■ Plaintiff is entitled to judgment under the "Changes" cause of the contract for the additional expenses incurred in washing with soap and water those plaster surfaces which could have been cleaned by wiping to accomplish the results required by the specifications. The amount of recovery will be determined pursuant to Rule 47(c). See e. g., Stein Bros. Mfg. Co. v. United States, 337 F.2d 861, 162 Ct.Cl. 802 (1963).

*Claims 2 and 3*

*Painting Baked Enamel Doors and Counters and Hammertone Air Units*

The following paragraphs of the specifications are pertinent to these claims: [8]

5-1. GENERAL.—This section of the specification includes interior painting of all previously painted or varnished surfaces within the areas shown on the drawings by Symbols P-1, P-2, P-3, etc., except as otherwise noted or specified in itemized schedule.

\* \* \* \* \* \* \*

5-2. Surfaces to be finished within the above mentioned areas are described in detail in the following "Itemized Schedule" also as included and described under "General Color Schedule".

5-3. NOTE.—Certain surfaces and materials within the areas shown to be painted are *NOT* to be painted. See paragraph heading "WORK *NOT* INCLUDED".

5-4. ITEMIZED SCHEDULE.—The following items of work included only within the areas shown to be painted, except as noted otherwise, shall be painted as specified:

(a) Plaster walls, and ceilings and masonry or concrete walls, beams, columns and ceilings.

(b) Base cabinets, shelving, partitions, etc., under screenline counters and elsewhere (inside and outside) including fronts only of all metal drawers (if any).

(c) Exposed piping of every kind including any existing pipe covering, hangers or straps.

(d) Exposed new or existing electric cabinets including conduits and metal raceways, outlet box blank covers, junction and pull boxes.

(e) Walls and ceilings of vaults shown by symbol only.

(f) Repainting previously painted woodwork including painting all face edges of wood lock boxes on workroom side. (No painting is required on interior of lock boxes and drawers.)

(g) Repainting presently varnished surfaces except in certain spaces as specified.

(h) Revarnishing presently varnished surfaces in the following area:

Space    Surfaces to Revarnish
         Walnut wainscot.
P-10    Trim (walnut and metal) Doors.

(i) Doors and trim only to be refinished in area P-11.

(j) Doors, trim, ceiling and beams only to be refinished in area P-12.

(k) Exposed metal work which shall include items generally as follows, and as described under General Color Schedule:

1. Wire mesh partitions, guards and metal partitions.

2. Grilles, louvres and registers.

3. Radiators and radiator shields, grilles and covers.

---

8. Since a hammertone finish is similar to a baked enamel finish, the two claims are considered together here.

4. Pipe railings and angle guards.

5. Both sides of vault doors.

6. Unit Heaters.

7. Steel wainscot at columns and walls of workrooms.

8. Metal chutes,

9. Elevator doors (both sides) and trim of all previously painted elevator doors in spaces showing on drawing for repainting.

10. Metal stringers, risers, balusters, newels, steel pipe railings, pipe handrails of metal stairways.

(l) Exposed ventilating ducts and louvres at ceiling and elsewhere, including hanger rods and straps.

(m) Metal conveyors including supports, guard screening and assemblies, catwalks, steel ladders, etc.

(n) All free standing columns and wall columns or pilasters in all Post Office working spaces and Storage Rooms shall be numbered on two faces (opposite sides) of columns as directed. Wall columns or pilasters to be numbered on one face.

(o) Paint yellow designation bank 12 inches wide around all columns where drinking fountains occur.

(p) All glazed terra cotta walls and wainscots in areas specified for painting shall be thoroughly cleaned (only).

(q) Paint red designations at all Fire Extinguishers.

(r) Reletter all numbering and titles on all solid panel doors that are painted out.

5–5. WORK NOT INCLUDED:

(a) Brass, bronze or nickel plated work.

(b) Stainles steel.

(c) Interior of lookouts.

(d) Interior of vaults except as shown on drawing by symbol to be painted.

(e) Walls and ceilings only in area P-11.

(f) Walls only in area P-12.

(g) Interior of elevators and elevator cabs and elevator shafts, except as otherwise specified.

(h) Finishing of wood and cement floors.

(i) Glazed terra cotta walls and wainscots (cleaning only).

(j) Movable furniture.

(k) Equipment except conveyors.

(l) Belts, rollers and motors in connection with conveyor equipment.

\* \* \* \* \* \* \*

5–12(E). SCHEDULE OF PAINTING FINISHES:

Work included .............................Painting or Finishing material.

Plaster walls and ceilings of toilets, service closets, locker rooms and similar spaces. — Type 3 Finish.

All other plaster ceilings, underside of lookouts. — Type 1 or 2 Finish.

Plaster walls and columns including plaster walls of lookouts. — Type 3 Finish.

Woodwork (Varnish or painted) ..............Type 3 Finish.

Concrete ceilings, beams and masonry work ......Type 1 or 2 Finish.

Concrete columns ..........................Type 3 Finish.

Metal trim and doors (lacquered) .............Type 3 Finish.

Metal work including wire mesh grille work ......Type 3 Finish.

Ventilating ducts and Framework .............Type 1 or 2 Finish.

Metal wainscots, radiators and radiator guards ... Type 3 Finish.

Metal conveyors, with supports Guard Screening and assemblies Type 4 Finish.

All items of work not scheduled shall be painted the same as adjacent finish.

* * * * * * *

5-57. COLOR SCHEME. (This paragraph provided in pertinent part that doors should be painted a medium green, that walls should be painted a light green, and that the ceilings should be painted white.)

5-58. The following is the color scheme for all other surfaces and spaces that are included in areas shown to be painted and that have not been previously mentioned:

* * * * * * *

Counters:—Partitions, cabinets and shelving under counters—Match door.[9]

The principal issue against this background is whether a baked enamel surface is a previously painted surface within the meaning of paragraph 5-1 which requires "painting of all previously painted or varnished surfaces. * * *" Plaintiff contends that a baked enamel surface in its original state is not a previously painted surface within the meaning of the specification and that the requirement, imposed on it by the contracting officer, to paint such surfaces entitles it to extra compensation under the "Changes" clause.[10] More particularly, it says that baked enamel is a factory finish arrived at by chemical and heat treatment of metal surfaces (such as appear on metal kitchen cabinets, automobile bodies, etc.) and that under the custom and usage of the trade such a surface in its original state is not considered a previously painted surface. As evidence of custom and usage, it submitted to the Board a joint statement signed by three painting contractors located in three separate regions of the United States (which statement was not denied or rebutted), declaring that "Each of us has had many years of commercial and industrial painting experience;" and that "Each of us states that based upon his experience and in accordance with the customs and established practice in such industry, baked enamel finished surfaces are not considered as a previously painted surface, where repainting is required for a previously painted surface." [11] The Board, however, did not

9. This paragraph contained a note stating "See diagrammatic color schemes on Drawing No. 36–PG–4A–REM for detail information on color scheme and division of colors." Pursuant to an order for call issued by the commissioner on his own motion, the drawing was filed by the defendant over its objection on the ground that it assertedly was not part of the administrative record before the Board. The drawing, upon examination, does not appear to be relevant to the issues presented and thus has not been considered here. No opinion is intimated as to the procedure that would have been followed were the drawing relevant.

10. The subcontractor by letter dated December 11, 1957 (which was in evidence before the Board) expressed disagreement with the GSA engineer's interpretation that metalwork having baked enamel finish was to be refinished as provided for other metalwork. He said he disagreed on the ground that in the many years he had been doing Federal work, the government had consistently excluded baked enamel finished metalwork in all areas specified to be repainted. He added: "That it is not the intention of the Government to require repainting of such

surfaces is evidenced by the fact that the use of the paint material specified for metalwork would serve to ruin the fine factory-baked enamel finishes now existent." The contracting officer denied the claim, stating that paragraph 5–1 included interior painting of painted or varnished surfaces within the areas shown on drawings by symbols, except as otherwise noted or specified in itemized schedule; that paragraph 5–5 titled "Work Not Included" did not exclude repainting of baked enamel finished doors; that paragraph 5–12(E) "Schedule of Painting Finishes" specifed metal trim and doors (lacquered) to have Type 3 finish; and that under the "General Color Schedule" paragraph 5–57, painting and finished color of all doors in spaces P–1 to P–13, inclusive, shown on drawings was specifically included.

11. As further evidence of trade usage, plaintiff made reference to specifications issued by GSA for two later painting jobs, one of which expressly excluded from the work to be done all painting of baked enamel finishes, while the other excluded not only baked enamel finishes but murals as well. The Board correctly concluded that the language quoted from these con-

consider this evidence on the ground that it did not find any ambiguity in the specifications and, consequently, did not believe it was required to resort to trade practice or custom to show the intention of the parties. Instead it held that on the face of it a baked enamel surface is a painted surface.

Admittedly, as asserted by Appellant, [the Board said] baked enamel is a factory finish arrived at by heat treatment of metal surfaces. But the basic question is what is applied to the metal to obtain the finish. The answer is obvious—enamel. Enamel is a paint. Accordingly, a baked enamel surface is a surface which results from applying enamel (paint) to metal.

▇▇ The Board's failure to consider the evidence of trade practice and custom on the basis of absence of ambiguity was in error. For the principle is now established in this court (and almost every other court) that in order that the intention of the parties may prevail, the language of a contract is to be given effect according to its trade meaning notwithstanding that in its ordinary meaning it is unambiguous.[12] That is to say that trade usage or custom may show that language which appears on its face to be perfectly clear and unambiguous has, in fact, a meaning different from its ordinary meaning.[13] See e. g., Buffalo Merchandise Warehouses v. United States, 115 Ct.Cl. 568, 572, 88 F.Supp. 276, 277 (1950); Ricker v. United States, 126 Ct.Cl. 460, 465–466, 115 F.Supp. 193, 196–197 (1953), cert. denied 347 U.S. 927, 74 S.Ct. 530, 98 L.Ed. 1080 (1954); Alabama Chemical Co. v. International Agricultural Corp., 35 F.2d 907, 909–910 (5th Cir. 1929); Distillers Distributing Corp. v. Sherwood Distilling Co., 180 F. 2d 800, 804 (4th Cir. 1950); Hurst v. W. J. Lake & Co., 141 Or. 306, 16 P.2d 627, 89 A.L.R. 1222 (1932); Ermolieff

tracts did not necessarily represent the practice of the trade, but merely represented the requirements on these two jobs. However, the defendant now argues that such later provisions conclusively rebut the argument that it is the custom and practice not to consider baked enamel surfaces as "previously painted": It says that were such, in fact, the custom and trade practice, there would be no reason to specify in the later contracts that such surfaces should not be painted. But this overlooks the consideration that the provisions could well have been included in the later contracts for the very purpose of incorporating therein specifically, rather than by implication, the established custom and usage of the trade. Defendant's argument, moreover, would lead to the *reductio ad absurdum* that the painting of murals, as an example, was required by the present contract (a construction which defendant itself characterizes as absurd), which result would follow from the fact that the contract at issue did not exclude murals from the painting requirements while the later contract did. Under defendant's reasoning, if murals were not required to be painted under the present contract, there would be no reason to specify in the later contract that murals should not be painted.

12. The doctrine of earlier cases was that ordinary terms and expressions could not be altered by usage and that usage, while admissible to explain what was doubtful, was not admissible to contradict what was plain. Williston, op. cit. infra, § 650, p. 17, fn. 2. This doctrine would appear to have been unfortunate in tendency since it served to frustrate the intention of the parties by preventing them, through refusal to admit evidence of usage, from showing what the real meaning of the written words was. See Wormser Admissibility of Evidence of Trade Usage, 33 Yale L.J. 172 (1923).

13. In view of this conclusion, it is unnecessary to determine whether or not the term "previously painted surfaces" is ambiguous on its face. However, it might be noted in passing that under the Board's rationale that a surface containing paint is a "previously painted surface" within the meaning of the specification, a wall containing a mural or painted frescoe would likewise appear to fall in this category and thus have to be painted. This illustrates that frequently no absolute meaning can be given to words; that "words and phrases are chameleon-like"; and that their "color, significance and connotation are frequently dependent upon their user." Dorsey v. Oregon Motor Stages, 183 Or. 494, 505, 194 P.2d 967, 972 (1948).

**1000**

v. RKO Radio Pictures, 19 Cal.2d 543, 122 P.2d 3 (1942); Restatement, Contracts, § 246 and comment on clause (a); Williston on Contracts (3d ed.) §§ 648, 650; Wigmore on Evidence (3d ed.) § 2463, pp. 203–4; McBain, The Rule Against Disturbing Plain Meaning of Writings, 31 Cal.L.Rev. 145 (1943); Patterson, The Interpretation and Construction of Contracts, 64 Col.L.Rev. 833, 839–44 (1964). Cf. e. g., Crooks Terminal Warehouses v. United States, 92 Ct. Cl. 401, 416 (1941); Pioneer Constructors v. Symes, 77 Ariz. 107, 267 P.2d 740, 41 A.L.R.2d 668 (1954). The defendant contends, however, that plaintiff has not shown that the government was actually aware of the trade usage and hence that it may not be bound by it. The short answer is that such knowledge will be presumed when (as here) the evidence shows the usage was an established, well-defined and obviously well-recognized one. Buffalo Merchandise Warehouses v. United States, 115 Ct.Cl. 568, 572, 88 F.Supp. 276, 277 (1950); United States v. Stanolind Crude Oil Purchasing Co., 113 F.2d 194, 200 (10th Cir. 1940); Gelb v. Automobile Ins. Co. of Hartford, 168 F.2d 774, 775 (2d Cir. 1948); Restatement, Contracts § 247; Williston op. cit. supra, § 661. Moreover, in view of the fact that there was no provision in the contract which expressly or by implication precluded resort to usage in defining the meaning of its terms, plaintiff's reliance thereon to determine the meaning of the specification requirement in question was entirely reasonable; any ambiguity on this score must be resolved against the government as the drafter of the instrument. E. g., Peter Kiewit

Sons' Company v. United States, 109 Ct. Cl. 390, 418 (1947).

██ On the basis of trade usage, it must be concluded that baked enamel (and hammertone) surfaces in the original state were not "previously painted surfaces" within the meaning of paragraph 5–1 and thus not within the scope of the work required. It is quite true (as the Board observed) that baked enamel finished doors and counters were not specifically excluded by paragraph 5–5 of the specifications which set forth an itemized list of the work not included. But it would seem pointless to have specifically excluded such work in paragraph 5–5 when the scope of the work itself, as set forth in paragraph 5–1, did not include such surfaces. The same consideration is applicable with respect to paragraph 5–4 which included in the list of various items to be painted subparagraph (k) which required painting of exposed metalwork, including "Elevator doors (both sides) and trim of all previously painted elevator doors in spaces shown on drawing for repainting." [14] Again, since the scope of the work, as defined in paragraph 5–1, did not encompass baked enamel finished surfaces in their original state, it would appear that paragraph 5–4 pertained only to such of the baked enamel metal surfaces as had later been painted over with a brush or spray. And for the same reasons, the color requirements specified in paragraphs 5–57 and 5–58 for doors, counters and partitions would not seem applicable to those doors, partitions and counters which still retained an original baked enamel finish as distinguished from

14. In argument before the Board and here, plaintiff's counsel stated that the GSA representative did not require the subcontractor to paint those elevator doors which were in their original baked enamel state, but required painting only of those elevator doors which had previously been painted over. From this plaintiff maintains that the GSA representative considered a baked enamel finish in its original state not to be "previously painted" and that to be consistent, he should likewise not have required painting of any other surface (e.g., partitions and doors) which remained in their original baked enamel (or hammertone) state. This argument, however, assumes facts not established by the record since no evidence was presented administratively to show that the surface composition of the elevator doors was baked enamel or that the GSA representative did not require painting of elevator doors which retained their original baked enamel finish.

those whose surfaces had been later painted over.[15]

Plaintiff is entitled to judgment under the "Changes" clause of the contract for the expenses incurred in painting those surfaces which had a baked enamel or hammertone finish. The amount of recovery will be determined pursuant to Rule 47(c).

### CONCLUSION OF LAW

Upon the foregoing opinion, which includes therein the findings of fact made by the court as a part of its judgment herein, the court concludes as a matter of law that plaintiff is entitled to judgment under the "Changes" clause of the contract for the additional expenses incurred in washing with soap and water those plaster surfaces which could have been cleaned by wiping to accomplish the results required by the specifications and for the expenses incurred in painting those surfaces which had a baked enamel or hammertone finish. The amount of recovery will be determined pursuant to Rule 47(c).

15. It bears mentioning that paragraph 5-12(E) "Schedule of Painting Finishes" specifed that *lacquered* metal trim and doors were to be painted with a type 3 finish but was silent as to the type of finish to be used for baked enamel doors. The absence of such specific requirement would in such circumstances seem some indication at least that the specifications did not contemplate their painting.